---

(Nos. 10646-10708.—Judgment affirmed.)
John Frederick Wallach *et al.* Appellants, *vs.* Cornelius K. G. Billings *et al.* Appellees.

*Opinion filed February 21, 1917.*

1. Banks—*what allegations in bill against a director show that he was a non-resident.* Where a bill by stockholders charging a director with negligence alleges that for five years he was out of the State within the meaning of the Statute of Limitations but that during that period he came into the State about three times a month it must be inferred that he was a non-resident, as otherwise such allegations are irreconcilable.

2. Same—*duties of a bank director vary according to the circumstances.* The duties of a bank director vary according to the business, circumstances and situation of every individual bank, and it is not possible to specify what particular things he must do in order to avoid the imputation of negligence in the management of the bank's affairs.

3. Same—*when bank directors are liable for losses to stockholders.* Generally speaking, bank directors are liable to stockholders for losses where such losses are the proximate result of a breach or neglect of duty on their part, but they are not insurers and are not necessarily liable for every loss which happens to occur.

4. Same—*when stockholders cannot complain of acquiescence of director in misappropriations of the president.* Stockholders can not complain of acquiescence by a director in misappropriations by the president of the bank where they allege in their bill charging

such director with negligence that such misappropriations were not hidden or concealed and that any business man of ordinary intelligence could have ascertained the condition of affairs, since, being stockholders and members of the corporation, they are likewise responsible.

5. SAME—*when stockholders may be said to have acquiesced in transactions of officers of bank.* Means of knowledge within reach of stockholders by the exercise of slight diligence is in legal effect equivalent to knowledge of the doings of the officers of a bank, and long delay by a stockholder with full knowledge, or at least with sufficient notice or means of knowledge, of his rights, and a recognition of transactions or acts inconsistent with their repudiation, is an acquiescence on the part of such stockholder.

6. SAME—*non-resident director not necessarily held to same degree of care as residents.* A non-resident director of a corporation is not necessarily, and regardless of the particular circumstances, held to the same degree of care and attention to the business of the corporation as is required of resident directors.

APPEAL from the First Branch Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. LOCKWOOD HONORE, Judge, presiding.

NEWMAN, POPPENHUSEN & STERN, and FOREMAN, ROBERTSON & BLUMROSEN, (JACOB NEWMAN, and CHAS. T. FARSON, of counsel,) for appellants.

MEAGHER, WHITNEY, RICKS & SULLIVAN, (JAMES F. MEAGHER, and JESSE J. RICKS, of counsel,) for appellee Cornelius K. G. Billings.

ROSENTHAL & HAMILL, (LESSING ROSENTHAL, of counsel,) for appellees Bernhard Rosenberg and Sidney Loewenstein.

Mr. CHIEF JUSTICE CRAIG delivered the opinion of the court:

On July 16, 1910, certain stockholders of the Chicago National Bank, on behalf of themselves and all other stockholders who might choose to become parties to the suit,

filed their bill of complaint in the circuit court of Cook county against Cornelius K. G. Billings and the Chicago National Bank for an accounting of moneys, funds and property of the bank alleged to have been misappropriated by John R. Walsh during the years from 1901 to 1905, both inclusive, while he was president of said bank, which moneys, funds and property were alleged to have been lost to the bank by reason of the alleged negligence of the defendant Billings in failing to perform his duties as a director of the bank. · The prayer of the bill was that the damages which the bank sustained by reason of the alleged negligence of Billings be ascertained, and that he be ordered to pay over to the bank the damages so ascertained, or to complainants and such other stockholders as might become parties to the suit the proportion of such damages which the number of shares held by them bears to the entire capital stock of the bank.

On November 21, 1910, the complainants filed a supplemental bill, in which, as thereafter amended, it was among other things alleged that the amount for which the defendant Billings is liable on account of the matters set forth in the original bill is about $3,500,000, but that the present directors of the bank are attempting to aid him to cancel and discharge his liability to the bank by the payment of the sum of $152,125 and thereby forestall and defeat the proceedings instituted by the complainants; that the directors have accordingly caused a meeting of the stockholders of the bank to be called; that the directors own or will be able to control a majority of the shares of the stock of the bank and will be able to pass such resolutions at the proposed stockholders' meeting as they desire, and have agreed with Billings to adopt a resolution at such meeting accepting the proposition made by him; that the directors are friendly to Billings and will do all within their power to shield and protect him against loss and damage resulting from the prosecution of the proceedings instituted by the complain-

ants; that the bank is not now, and has not been since December 18, 1905, doing any business; that its creditors have all been paid and there only remains for the bank to enforce the liability of its former directors and collect its assets, which, aside from the liability of the defendant Billings, amount to practically nothing, and to make distribution among its stockholders; that a receiver ought to be forthwith appointed to take charge of the assets, papers, books and documents of the bank and to take and receive whatever shall be realized from or on account of the liability of Billings to the bank; that such receiver should be authorized, under the direction and control of the court, to make such adjustment and settlement with Billings of his liability as may be just and equitable and as will meet the approval of the court, and to make proper distribution of the moneys received by him from Billings among the stockholders of the bank under the direction of the court; that such receiver should be authorized to commence and prosecute in the name of the bank such action or actions at law as may be necessary or proper to enforce the liability of Billings to the bank.

In addition to the Chicago National Bank and Cornelius K. G. Billings the directors of the bank were made defendants to the supplemental bill. The prayer of the supplemental bill, as amended, was for a temporary injunction restraining the directors and stockholders of the bank from consummating or attempting to consummate the proposed settlement, or any like settlement, with Billings, and for the appointment of a receiver to take, keep and retain possession of the assets, property, papers, books and records of the bank, and to commence and prosecute in the name of the bank such action or actions at law as may be proper or necessary to enforce the liability of Billings to the bank. A temporary injunction was issued without notice, in accordance with the prayer of the supplemental bill. Thereafter the defendants entered their motion to dissolve the

injunction, and this motion, together with the motion of the complainants for the appointment of a receiver, came on for hearing before the court. After hearing the evidence adduced by the respective parties, the court, on December 20, 1910, entered an order denying the defendants' motion to dissolve the injunction and appointing William C. Niblack receiver "of all claims, demands and causes and rights of action against the defendant Cornelius K. G. Billings arising out of or resulting from his alleged failure to perform properly his duties as a director of the defendant the Chicago National Bank." The receiver was by the order of appointment authorized and directed "to commence and prosecute such suit or suits, action or actions, proceeding or proceedings, at law or in equity, in any proper jurisdiction or court, either within or without the State of Illinois, as he may be advised are necessary or proper to collect, prosecute, enforce and reduce to possession all such claims, demands and causes and rights of action." From this order the defendants prosecuted an appeal to the Appellate Court for the First District. The Appellate Court reversed that part of the order relating to the injunction on the ground that it was in violation of section 5242 of the Revised Statutes of the United States, which provides that no injunction shall be issued against any national bank, before final judgment, in any suit, action or proceeding in any State, county or municipal court, but affirmed that part of the order appointing a receiver. *Wallach* v. *Billings,* 161 Ill. App. 317.

After the filing of the opinion of the Appellate Court, and on July 8, 1911, Cornelius K. G. Billings filed a general and special demurrer to the original bill, the special ground of demurrer being that the directors of the Chicago National Bank, during the years from 1901 to 1905, inclusive, were necessary parties to the bill. On June 3, 1913, the demurrer was sustained and the complainants were given leave to file an amended and supplemental bill. On November 4, 1913, the complainants filed what is termed their

amended and supplemental bill, making various persons, including William C. Niblack, "as receiver of the cause of action in favor of the bank against Cornelius K. G. Billings," defendants with the Chicago National Bank and Cornelius K. G. Billings.

The amended and supplemental bill sets out that the Chicago National Bank was organized under the national Banking act in 1881 with a capital stock of $300,000, which was increased from time to time and in 1900 was increased from $500,000 to $1,000,000; that its charter was extended in 1901 for an additional term of twenty years; that during its existence it had, under its by-laws, a nominal board of seven directors; that Billings was a member of the board from January 12, 1892, until after December 18, 1905, on which date the bank failed; that during each of those years he took and subscribed the oath required of a director by the national Banking act, said oath stating, among other things, that as such director "he will, so far as the duties devolve upon him, diligently and honestly administer the affairs of such association;" that during the first nine years of that time he gave very little attention to the affairs of the bank and during the last three and a half years he gave them no attention whatever, did not attend the directors' meetings and made no inquiry or investigation concerning the condition of the bank or of its funds; that in 1901 he entered into a secret agreement with John R. Walsh, president of the bank, which provided that as long as he was a director of the bank he should do nothing in the way of administering its affairs, should exercise no supervision over its business or affairs and should do nothing whatever as a director of the bank; that Billings was a man of great wealth and had great business and financial skill and acumen and was in no way under the control of or dependent upon Walsh or any director or officer of the bank, and that if he had given the bank the reasonable supervision which the depositors and stockholders had the right to demand at

his hands, the business affairs and property of the bank
would have been safe. The bill sets out with great detail
the misapplication of the funds of the bank by Walsh, its
president, and how such funds were used in making loans
to various corporations and enterprises which he controlled.
It is further alleged in the bill that the means employed by
Walsh to improperly use the bank's funds appear plainly on
the books of the bank; that there was nothing concealed or
covered up; that the skill or experience of expert account-
ants was not at all necessary to discover the true condition
of things, and any business man of ordinary intelligence and
experience could have ascertained the financial condition of
the bank and the enormous loans made to the private enter-
prises of Walsh from January 1, 1900, up to December 18,
1905, when the bank closed its doors; that as a direct re-
sult of the wrongful misappropriations by Walsh the com-
plainant stockholders sustained a loss of over $300,000 and
the bank was compelled to suspend and cease doing busi-
ness on December 18, 1905; that in 1897 the comptroller
warned the board of directors of the bank that Walsh had
at that time been making unlawful and fraudulent loans to
himself; that a letter from the comptroller was read to the
directors at a meeting of the board in August, 1897, at
which Billings was present, and an answer was prepared,
signed by all the directors, including Billings, in which they
promised that the unlawful transactions would be promptly
corrected; that on June 3, 1898, the comptroller sent an-
other letter to the board calling the attention of the direct-
ors to the misuse of the bank's money by Walsh, which
letter was read at a meeting of the board, but it is not al-
leged that Billings was present or had his attention called
to this letter; that in November, 1903, the comptroller
made a rigid examination into the condition of the bank
and found that it was in an extremely dangerous financial
condition owing to the large sums of money which Walsh
had fraudulently withdrawn and used to further his private

enterprises; that on June 26, 1905, the comptroller wrote
a letter to the bank setting forth with great detail and par-
ticularity the vast sums of money which Walsh had unlaw-
fully taken from the bank and used to promote his private
enterprises, and insisting that the money be immediately re-
stored to the bank or some action would be taken by him;
that in December, 1905, the comptroller threatened to ap-
point a receiver and wind up the bank, and because of his
threat so to do the Chicago Clearing House Association,
for the purpose of preventing a public panic, advanced the
money with which to pay the general depositors, and that
left the stockholders to get what they could. The bill also
alleges that on or about February 26, 1910, and prior to
the filing of the original. bill of complaint herein, the com-
plainants requested and demanded of the bank and of its
board of directors that the bank institute and prosecute
proper proceedings at law or in equity to recover from
Billings the amount for which he is liable to the bank on
account of the wrongful neglect of his duties as a director,
as set forth in the bill, but that the bank and its board of
directors refused to institute any proceeding at law or in
equity against Billings; that William C. Niblack has been
appointed in this proceeding receiver of the cause of action
in favor of the bank against Billings, and the complainants
ask that he be continued as such receiver. The bill states
that the allegations contained in the supplemental bill, as
amended, were true when made and asks that the allegations
thereof be considered a part of this bill so far as may be
necessary to sustain the appointment and continuance in of-
fice of Niblack as receiver of said cause of action. The
prayer of the amended and supplemental bill is that Wil-
liam C. Niblack be continued as receiver herein of the cause
of action; that Cornelius K. G. Billings be adjudged to be
liable to the bank for and on account of the wrongful neg-
lect of his duties as a director of the bank; that the amount
of the loss and damage sustained by the bank be ascertained

and Billings be decreed to pay the same to the bank, or to Niblack as receiver, or to the complainants and other stock-holders of the bank, as the court shall determine to be just, right and equitable.

Two of the directors who were made parties defendant, Best and Rosenfield, filed disclaimers and the bill was dismissed as to them.

Cornelius K. G. Billings filed a general demurrer to the bill, which was sustained, and the bill was dismissed for want of equity at the complainants' costs. The final decree provided that the complainants, or any one or more of them, might prosecute an appeal to the Appellate Court for the First District. Two separate appeals were prosecuted to the Appellate Court,—one by John Frederick Wallach and a portion of his co-complainants, and the other by certain other complainants. These appeals were consolidated in the Appellate Court and the decree of the circuit court was there affirmed. The Appellate Court granted a certificate of importance in each appeal, the complainants have prosecuted separate appeals to this court, and these appeals have been consolidated here.

Appellee Billings urges the following reasons for sustaining the demurrer to the bill and affirming the judgments of the circuit and Appellate Courts: That his neglect or inaction set out in the bill was not a breach of duty on his part; that it is not shown by the bill that such neglect or inaction was the proximate cause of the bank's loss; that the complainants are not the proper parties to bring suit; that the necessary parties have not been sued; that the suit is not in the proper tribunal, and that the complainants must be held to have acquiesced in the acts of neglect of Billings and the wrongs complained of. If any one of these objections to the bill is well taken the demurrer to the bill should be sustained.

As to whether the bill shows neglect by Billings, reference is made in the amended bill of complaint to a similar

suit brought against Billings in the circuit court of the United States for the southern district of New York, and it is alleged that he was served with process there. The amended bill also alleges "that from about January 1, 1901, down to the present time, Cornelius K. G. Billings has been out of the State of Illinois within the meaning of the Statute of Limitations." It is contended by counsel for Billings that this allegation, taken together with the fact that the bill does not allege that Billings ever was a resident of the State of Illinois, sufficiently shows his non-residence. Another allegation in the bill covering the period between the years 1900 and 1905, is, "that he was in the city of Chicago during all of said years on an average of not less than three times a month." The two allegations are irreconcilable unless Billings was, in fact, a non-resident, for if he was a resident of the State of Illinois and came into the State three times a month during said period then it could not be said that during that period he was out of the State within the meaning of the Statute of Limitations, but if a non-resident were to come into the State three times a month during that period it could be said of him that during that period he was out of the State within the meaning of the Statute of Limitations. Section 5146 of the national Banking act provides that "at least three-fourths of the directors must have resided in the State, territory or district in which the association is located for at least one year immediately preceding their election and must be residents therein during their continuance in office."

It is contended in this connection by counsel for Billings that under the allegations of the bill Billings, while a director of the bank, was a non-resident director, and that with a bank as large as the Chicago National Bank, with its large volume of business and necessary business connections as shown by the bill, it was a business necessity to have one or more non-resident directors, whose usefulness as directors would arise from the very fact of their non-

residence and connection with other financial institutions situated at a distance from the city where the bank of which they are directors is located. It is further argued that while such directors have duties to perform which in a way are no less important than the duties devolving upon local directors, it is not their business to, and they cannot be expected to, exercise a supervision over local loans or the immediate conduct of the bank by the officers thereof; that such duties devolve upon the resident directors, and for that reason, so far as shown by the bill and taking its allegations most strongly against the pleader, the bill does not set up a cause of action against Billings. If Billings was a non-resident director,—and this must be inferred from the allegations of the bill,—then it would seem that he would not be liable except for some act of negligence on his part in connection with his duties as such non-resident director, and he would not necessarily be liable for losses which, under the ordinary distribution of the duties of directors, were caused by the inattention of directors who were residents and whose duty it would clearly be to supervise loans and the immediate conduct of the bank's affairs. It is not charged by the bill that Billings, as a director, had any specific duties to perform, or any duty except to exercise his business judgment, according to circumstances, in the conduct of the bank; nor do we conceive how any such charge could be successfully made unless certain matters had been turned over to Billings on which to act in behalf of the bank. The duties of a bank director vary according to the business, circumstances and situation of every individual bank, so that it would be impossible to specify any particular thing that he should do. What would be a good loan or a good investment or good business for a bank in one year or in one locality might be the very worst kind at another time or for another bank. This being true, the allegation in the bill that Billings had entered into a secret agreement with Walsh, the president of the bank, by which the

former, as director, was not to be expected to attend the
directors' meetings in Chicago or to be responsible for the
local management of the bank, loses its force. If Billings,
as a director, was guilty of neglect of duty, the fact that he
had an agreement or understanding with the president of
the bank that he would neglect his duties would not afford
any justification on his part, and he would be equally guilty
whether he had made such agreement or not. If the pur-
pose of the allegation is to show a deliberate intent on the
part of Billings to neglect his duties, the fact that he was
a non-resident director is important, as in such case it might
well have been that he was elected with the full understand-
ing and agreement of the president of the bank and the
other directors that his duties and responsibilities would be
different from what they are charged to be in the bill, and
this may have been in entire good faith on his part and the
others and entirely consistent with good banking.

Assuming, however, for the purpose of the argument,
that a non-resident director has the same duties as to at-
tending meetings or supervising loans and other matters
pertaining to the bank management as resident directors, do
the allegations of the bill show that the non-attendance or
inattention of Billings was the cause of the losses resulting
from a misapplication of the funds of the bank by Walsh,
the president? The amended bill avers that during the years
1901, 1902, 1903, 1904 and 1905, when Billings was a di-
rector of said bank and during which time the principal
losses were sustained, all of the directors of said bank ex-
cept Billings were under the domination and control of John
R. Walsh and obeyed implicitly his orders to them. The
bill avers as to Billings that he was in no way, shape or
manner subservient to and dependent upon or under the
influence of Walsh or of any director or officer of the bank.
The allegation that all the other directors of the bank ex-
cept Billings were subservient to the president, Walsh, was
omitted from the final amended and supplemental bill, but

it was alleged in that bill that all of the officers of the bank were under the control and domination of Walsh and completely subservient to him and allowed him to do as he pleased with the funds of the bank. Whether it is intended by this allegation to include directors with those mentioned as other officers is not certain, but taking the allegation most strongly against the pleader, the term "officers" would ·include other directors. Taking the allegation in that sense, does the bill show that the losses to the bank were caused by the non-attendance of Billings at the directors' meetings or by the neglect of Billings?

The bill charges that the losses, or at any rate the greater portion thereof, sustained by the bank on account of the improper, unlawful and illegitimate transactions of Walsh were the direct or proximate consequence and result of the neglect and failure of Billings to exercise any care or diligence as a director. The entire losses of the bank were alleged to be about $2,200,000, and while the above allegation is a conclusion of the pleader, it is not alleged what proportion of the loss was proximately caused by the inattention and negligence of Billings. Do the allegations of the bill show that any part of the losses set out was the result of inattention of Billings?

In *Briggs* v. *Spaulding,* 141 U. S. 132, suit was brought by the receiver of the First National Bank of Buffalo against all the directors of the bank to recover for losses alleged to have occurred by reason of the negligence of the directors. In speaking of the duty of a director as an individual, the court, through Mr. Chief Justice Fuller, on page 146 of the opinion said: "Our attention has not been called, however, to any duty specifically imposed upon the directors, as individuals, by the terms of the act, although if any director participated in or assented to any violation of the law by the board he would be individually liable. The corporation, after the amendment of 1874, had power to carry on its business through its officers, and although

no formal resolution authorized the president to transact the business, yet, in view of the practice of fourteen years or more, we think it must be held that he was duly authorized to do so. It does not follow that the executive officers should have been left to control the business of the bank absolutely and without supervision or that the statute furnishes a justification for the pursuit of that course. Its language does enable individual directors to say that they were guilty of no violation of a duty directly devolved upon them. Whether they were responsible for any neglect of the board as such, or in failing to obtain proper action on his part, is another question."

In *Warner* v. *Pennoyer*, 91 Fed. Rep. 587, the court had under consideration a suit by a receiver of a national bank against the directors of the bank seeking to charge them with liability for losses alleged to have been caused by their negligence. The losses occurred through the defalcations of the cashier. The necessity of some connection between the negligence of the cashier and the loss was expressed in the following language (p. 591) : "Before they can be made responsible for losses which have occurred through the mismanagement or dishonesty of the cashier it must appear that such losses resulted as a consequence of the omission of some duty on their part. If, in all probability, these would have occurred just the same notwithstanding they had been ordinarily diligent and vigilant, there is no justice in shifting them upon the directors and no principle of law to justify it. They are responsible for their own acts and omissions but not for those of co-directors in which they have not actively or passively participated."

The general charge against Billings is that he neglected his duties as a director of the bank. It is not claimed that the bank lost any money by reason of any affirmative negligent act of Billings or that he had actual knowledge of the hazardous loans made by Walsh, and it is insisted in his behalf that it is not shown by the bill but that the losses

complained of would have occurred had he been present at the meetings of the board of directors or had done everything that could reasonably have been expected of him as an individual director. As said in *Warner* v. *Pennoyer, supra,* on page 593: "As to all these losses, the case for the complainant seems to have been prepared and presented upon the theory that when a bank has failed and it appears that there was a general supineness and looseness of management by the directors the burden of exoneration for the losses is on the directors. This is not a correct theory. If it were, the cases would be few in which the directors of a bank wrecked by the misconduct of a cashier could not be held accountable for all the losses. The court cannot decree upon conjecture. As against two of the directors the case for the complainant is predicated upon their failure to attend the semi-annual meetings of the board. It is not a necessary or legitimate inference that this omission was a contributory cause of the losses. It does not follow because a director has failed to attend meetings that he is legally or morally responsible for the disasters that may have befallen his bank. In the present case the board had provided for a reasonably vigilant supervision of the cashier. The cause of the losses was the neglect of those who had been appointed to keep watch of the discounts. Those directors who attended the meetings and had no reason to suppose that the members of the discount and examining committees were neglecting their duties are not responsible for the losses, which are solely attributable to such neglect. The directors who did not attend the meetings are in no worse category. What could they have done or prevented, exercising common diligence, if they had been present? A director who has failed to act is not liable for the thefts or shortcomings of the cashier unless it appears, inferentially at least, that his omission had some proximate relation to the losses."

It is the theory of appellants, in brief, that all that it is necessary to show in their bill of complaint is the inattention of Billings as a director and that the bank sustained losses. There is no doubt but that directors of a national bank are liable in some cases for losses to the bank of which they are directors, but it is equally true that they are not liable for every loss which happens to occur. Such a rule would make a bank director an insurer, which he is not. A director may be guilty of negligent acts which cause a loss or he may be guilty of negligence and inattention to his duties provided such negligence and inattention are the cause of such loss, and the latter proposition is conceded by counsel for Billings. There are many cases in which directors have been held liable and many others in which they have been held not to be liable. Decisions of the courts are not of great value as authorities, as each decision is based upon the facts of the particular case decided and in no two cases are the facts the same.

It is contended by counsel for appellants that if, under the facts set up in the bill, Billings is not liable for any part of the losses sustained by the bank, then no director of a bank can ever be held liable unless he personally misappropriates its funds, and, in fact, is himself an embezzler. It is further contended by them that the substantial question involved in the case is whether the director of a bank may intentionally, for a period of nearly four years, refuse to perform his duties as a director and escape responsibility for losses sustained by the bank by reason of such wrongful conduct. They have not shown by the bill that the losses were caused by the alleged neglect and no such case is made out by their bill. Neither do we hold that a director is not liable unless he is an embezzler. Liability of directors of a bank for losses to the bank, so far as any rule can be deduced from the various authorities and based on the facts of individual cases outside the question of proper parties, can be stated as follows: Where the directors of a corpo-

ration are guilty of a breach or neglect of duty and the proximate result of such breach or neglect of duty is a loss to the bank there may be a recovery from such directors. We do not hold that directors cannot be held for mere inaction or that it is necessary in a bill of this character to allege specific acts of neglect, but because the specific allegations that are made show that the neglect or inattention of Billings could not have been the proximate cause of the loss, and because it fails to show that he, under the circumstances, could have foreseen the results of his alleged inattention. We have been cited to no authority, and we are aware of none, which holds that a non-resident director of a national bank has been held liable for losses occurring under circumstances similar to those set up in the bill, nor to any case in which the director of a corporation has been held liable to the corporation for losses where there was not a causal connection between the negligence of the director and the loss sustained. It would be manifestly unjust to hold Billings, under the facts set up in the bill, to the same degree of attention to the bank's affairs as the resident directors, whose duty it unquestionably was to supervise the local loans and the management of the bank, and who, apparently by their active connivance, enabled Walsh to make the unlawful loans he did.

It will not be necessary to discuss the other grounds of the demurrer except the last one, urging that the complainants must be held to have acquiesced in the wrong complained of. This point may very properly be considered in connection with what has been heretofore said as to the knowledge of Billings of the actions of Walsh. We have called attention to the allegation of the bill that the transactions of Walsh were not hidden or concealed, and that any business man of ordinary intelligence and experience who had made a fair or reasonable effort to ascertain the financial condition of the bank could and would have discovered the condition of affairs. It must be remembered

that this is not a suit by depositors or creditors of the bank, but by the stockholders,—members of the corporation themselves. It is charged in the bill that Billings by the exercise of reasonable diligence could have ascertained the condition of affairs. Is not the same thing true of every one of the stockholders? For a period of seven or eight years the president of the bank was making illegal and hazardous loans. The facts charged in the bill as sufficient to have put Billings on inquiry would also have put the complainant stockholders on inquiry. The transactions of Walsh were in no way concealed from the complainants, and it appears from the arguments of counsel were a matter of general knowledge in the city of Chicago, where the complainants resided and where Billings did not reside. The liabilities as well as the rights of stockholders in banks and other corporations are well defined by law and have been rigidly enforced. They have something else to do besides drawing dividends. By the actions of Walsh extending over a series of years, the complainants in this case, as stockholders in the bank, were during that time rendered liable to the depositors and creditors of the bank not only for the loss of the value of the stock which they held and which loss they have sustained, but also to an equal amount under the national Banking law in case an assessment should be necessary against them. They are complaining of the very things which they should have inquired about and had knowledge of, and which they acquiesced in for a series of years. They are the ones who participated in the election of the board of directors dominated by Walsh, who, in turn, elected Walsh president and turned the management of the bank over to him. The non-residence of Billings must have been known to the stockholders who elected him year after year, and also the fact that he did not attend the meetings of the board. All the complainants in this case have been stockholders since January, 1900. The unlawful transactions of Walsh began before that time, as charged in the bill, for as

early as 1897 the comptroller of the currency objected to his methods. The bill does deny that the complainants had knowledge of the illegitimate transactions of Walsh prior to the closing of the bank, but it does not allege, as has been noted, that Billings had any knowledge of these transactions but merely alleges that he could have ascertained them and should have known them. But is not this true of the complainants themselves? It has been held that means of knowledge within reach of stockholders by the exercise of slight diligence is in legal effect equivalent to knowledge, and that where there has been a long delay by one with full knowledge, or at least with sufficient notice or means of knowledge, of his rights, and a recognition of transactions or acts inconsistent with their repudiation, there is acquiescence on his part. *Simmons* v. *Burlington, Cedar Rapids and Northern Railway Co.* 159 U. S. 278; 2 Pomeroy's Eq. Jur. 965.

For the reasons given, the judgment of the Appellate Court will be affirmed.                    *Judgment affirmed.*

---

(No. 11039.—Reversed and remanded.)
THE CITY OF CHICAGO, Appellee, *vs.* JAMES F. LORD *et al.*— (THE CHICAGO AND GRAND TRUNK RAILWAY COMPANY *et al.* Appellants.)

*Opinion filed February 21, 1917.*