Charles H. Albers, Appellant, v. Edward B. Sullivan, Appellee.

Gen. No. 38,674.

462

Opinion filed December 9, 1936.   Rehearing denied December 28, 1936.

WHITTY & McGAH, of Chicago, for appellant; FRANCIS L. BRINKMAN, of Chicago, of counsel.

KERN, STIEFEL & STIEFEL, of Chicago, for appellee; JACOB J. KERN and CHARLES W. STIEFEL, JR., of counsel.

MR. JUSTICE HEBEL delivered the opinion of the court.

This suit was instituted by the plaintiff William L. O'Connell, as receiver of the Kenwood State Bank of Chicago, against the defendant Edward B. Sullivan upon a promissory note, and judgment was entered by confession for $9,894.83. Thereafter the defendant appeared and filed his motion for leave to plead, which was allowed, and upon trial a verdict for the defendant was returned by the jury and the court entered judgment upon the verdict. Subsequent to the pendency of the appeal to this court the death of the plaintiff was suggested and Charles H. Albers was substituted as plaintiff and receiver of the Kenwood State Bank of Chicago.

The declaration of the plaintiff was based upon the promissory note, which contained a narrative and cog-

novit, and upon which the judgment by confession was entered.

The pleas filed by the defendant by leave of court, supported by the affidavit of merits, were the general issue; that the note sued on was secured by fraud and circumvention, and also that there was included in the promissory note certain amounts which were added without the consent of the defendant, and that the defendant denied liability except for the sum of $4,805.61, deducting certain amounts which the defendant alleged he was not liable for; and also as a defense defendant alleges that the plaintiff was indebted to him for $17,400 as damages occurring on January 23, 1931, when the Kenwood Bank transferred 600 shares of Swift & Company stock of the defendant held as collateral by a brokerage house, thus converting the stock to its own use, and that upon a recoupment the defendant will recoup to the extent of the amount due the plaintiff.

The facts are that the Kenwood State Bank of Chicago was a state bank organized under the State Banking Act, located and doing business at the southwest corner of 47th street and Woodlawn avenue, Chicago.

The bank was organized by a group headed by William L. Martin and Fred S. Williams, who for many years had been officers of the South Side Trust and Savings Bank, and that the defendant had been a customer of the South Side Bank and was known to Martin and Williams. Upon the organization of this bank the defendant became the owner of 25 shares of stock and was elected an initial director.

The defendant was connected with E. B. Sullivan & Co., a furniture sales corporation as a salesman. After the organization of the bank this company opened its account with the new bank. This state bank operated from December, 1929, until it was closed on June 22,

1932. The defendant had been a director from the date of its organization, and together with other members of the board of directors and officers took part in the affairs of the bank; he obtained his first loan from this bank on December 16, 1929, when he borrowed $1,050 for 91 days. Thereafter he continued to make additional loans and renew notes coming due, and, to secure the payment of these loans, he put up as collateral 150 shares of Swift & Company stock. Later new stock of this corporation was issued—four shares of the new stock for one share of the old. During the time of defendant's connection with the bank, the organizers, which included the defendant, privately made up a deficit of $6,500, and for this purpose the defendant gave his note for $750 on January 27, 1930. On the same day the original $1,050 note was renewed and it was increased from $1,050 to $1,500, but there is a dispute as to whether or not the defendant ever received the difference between the old note and the increased sum. There is also a dispute as to other items.

Later, the defendant borrowed $15,000, which was evidenced by three notes, each for $5,000, for which cashier's checks were given and collected through the clearing house.

On January 23, 1931, the collateral deposited by the defendant was delivered to Morrison & Townsend, and later sold for $13,000, and the amount received delivered to the bank by the brokers. This sum was applied to defendant's notes, leaving a balance due of approximately $5,176.50, for which amount the defendant signed a new note on February 26, 1931.

The controversy between the parties is largely on the question of the transfer of stock to and sale by a brokerage house on January 23, 1931.

One of the defenses offered by the defendant is that there existed a fiduciary relation between the defendant, one of the directors, and the bank. The ground

upon which he offers this defense is that at the time he was requested to act as one of the directors he mentioned that his eyesight was poor, and therefore he did not care to act. The officers of the bank, however, persuaded him to act upon their promise that "the officers of the bank will take care of and handle all of the papers and everything that comes up"; that because of this a fiduciary relationship existed and the defendant, relying upon the good faith of the officers, signed notes for larger sums than the amount received by him from the bank.

The defendant was a director of this institution, and he owed a duty to the stockholders and depositors, occupying as he did a position of trust. It is rather an anomaly for the defendant to urge that the bank through its officers occupied a fiduciary relation in acting for him, not alone as a borrower, but as a director of the bank as well. The fact is that the defendant immediately upon the organization of the bank became a borrower, and the sum total of the borrowed money amounted in the aggregate to $18,000.

Upon the trial, the plaintiff as receiver allowed several items to be deducted from the claim of $7,664.53, amounting to $2,231.30 leaving a balance due of $5,433.23.

During the time the loans were made the defendant did not reduce the principal or pay any accrued interest. The money so received from time to time, with the accrued interest, amounted to the aggregate sum above stated, from which was deducted $13,000 received from the sale of defendant's 600 shares of Swift & Co. stock, collateral to the notes.

In the discussion of this subject of a fiduciary relation, we will consider the bank as the dominant party and the defendant as the subservient party, assuming that the will of the defendant was subservient to the dominating control and influence of the officers of the

bank, and his actions were controlled by the good faith instilled in his mind by the promises of the dominating party. The facts in evidence, however, do not indicate that at the time the defendant signed the notes he was so dominated by the officers of this bank that his will to refuse was influenced to the contrary. His conduct indicates he has had business experience, and his acts at the bank in borrowing money did not display a lack of knowledge of the acts necessary to arrange for a loan. It would rather display a lack of honesty on his part in allowing his name to be used as a director to influence others to become depositors, and then use his position to obtain loans which he now seeks to defeat because of this alleged fiduciary relationship with the bank.

Depositors largely rely upon the character of the men who are directors of a bank and are generally impressed by the fact that they are men of business ability, and that is what attracts them in making deposits. In the case of *Chicago Title & Trust Co. v. Munday,* 297 Ill. 555, the Supreme Court makes this pertinent statement upon this question, which is applicable to the contention that the defendant seeks to avoid payment of the money borrowed from the bank of which he was a director:

"It is a matter of common knowledge that men of strong financial ability are asked to serve as directors of banks because of the feeling of security which the public will have from their connection with the corporation. That feeling of confidence arises out of the fact that the public, when depositing money in a savings bank or when taking stock in the corporation and divesting themselves of control of their property, expect, and have a right to expect, that the men selected as directors of a bank to control the property will exercise ordinary care and prudence, and when one takes a position as director of a bank he becomes trustee for

the depositors as well as for the stockholders and is bound to the observance of ordinary care and diligence, and is hence liable for injury resulting from the non-observance, where such non-observance is due to the negligence of such director. *Delano v. Case,* 121 Ill. 247.''

In applying this to the instant case we find that the defendant in acting as a director of the bank became a trustee, and he is chargeable with lack of care and diligence, and unquestionably is liable for any injury that may result from his failure to exercise the duties required of him as a director of the bank. It does not seem reasonable that this defendant should accept this position and then when it comes to making payment of money borrowed by him from depositors try to avoid doing so on the ground that a fiduciary relationship existed between the defendant and the officers of the bank; nor does it seem reasonable for defendant to take this position when he is in a measure responsible to the depositors for the money placed in the bank.

In the same case of *Chicago Title & Trust Co. v. Munday, supra,* the court laid down this rule:

''The rule with reference to determining the responsibility of a director for losses to his bank was laid down in *Wallach v. Billings,* 277 Ill. 218, as follows: 'Where the directors of a corporation are guilty of a breach or neglect of duty and the proximate result of such breach or neglect of duty is a loss to the bank there may be a recovery from such directors.' The responsibility of members of a board of directors of a bank is discussed in *Briggs v. Spaulding,* 141 U. S. 132, wherein it is said: 'Without reviewing the various decisions on the subject, we hold that directors must exercise ordinary care and prudence in the administration of the affairs of a bank, and that this includes something more than officiating as figureheads. They are entitled, under the law, to commit the banking busi-

ness, as defined, to their duly authorized officers, but this does not absolve them from the duty of reasonable supervision, nor ought they be permitted to be shielded from liability because of want of knowledge of wrong-doing, if that ignorance is the result of gross inattention.' '' And this rule is certainly applicable to the defendant in the instant case. He received the money from the bank and now offers this defense, which we feel is not a proper one under the facts, and as stated before, the court in admitting this evidence, as well as the instructions, erred.

From the facts in evidence, the unfortunate inability of the defendant to read clearly because of poor eyesight, is not a defense. It was his duty to have the contents of the notes read to him before signing them, which he did not do. The law is clear on this subject. In the case of *Malewski v. Mackiewich,* 282 Ill. App. 593, this court said, quoting from *Chicago, St. P., M. & O. Ry. Co. v. Belliwith,* 83 Fed. 437:

'' 'If one can read his contract, his failure to do so is such gross negligence that it will estop him from denying it unless he has been dissuaded from reading it by some trick or artificial practice by the opposite party. If he cannot read it, it is as much his duty to procure some reliable person to read and explain it to him before he signs it as it would be to read it before he signed it if he were able to do so; and his failure to obtain a reading and an explanation of it is such gross negligence as will estop him from avoiding it on the ground that he is ignorant of its contents. . . . The fact that, as we have seen, the plaintiff was charged under the law with full knowledge of the contents of this agreement is itself fatal to his claim for there could be no deceit where there was no ignorance and no concealment . . . . The solemn written agreements of men cannot be whistled down the wind by the testimony of one of the parties to them, to such a story as

this . . . the evidence in this case comes far short of that clear, convincing and unequivocal proof which would warrant either a jury or a court in finding either mistake, fraud or deceit in the execution of this contract, and the court below was in error when it refused to instruct the jury to return a verdict for the Company.' '' Under the facts and the law, the court erred in instructing the jury upon the question of fiduciary relationship.

There are other defenses to this action however which should be considered by a jury upon a retrial wherein the element of undue influence is not involved, especially the question of the alleged value and unauthorized sale of 600 shares of capital stock of Swift & Company by the brokers who were intrusted with defendant's stock by the bank and who held it as collateral security for the notes.

In commenting upon evidence that may be offered upon a retrial, this court wants it understood that the comment is for the purpose of determining the issues in this court only.

For the reasons stated in this opinion the judgment is reversed and the cause remanded.

*Reversed and remanded.*

Denis E. Sullivan, P. J., and Hall, J., concur.