162 N.J. Super. 355 (1978)
392 A.2d 1233
JOHN J. FRANCIS ET AL., AS TRUSTEES IN BANKRUPTCY OF PRITCHARD & BAIRD INTERMEDIARIES CORP., ETC., PLAINTIFFS,
v.
UNITED JERSEY BANK, ADMINISTRATOR OF THE ESTATE OF CHARLES H. PRITCHARD, ET AL., DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided August 18, 1978.
*359 Mr. Hugh P. Francis for plaintiffs (Messrs. Francis & Berry, attorneys).
Mr. Thomas J. Demski and Mr. Clive S. Cummis for defendants (Messrs. Sills, Beck, Cummis, Radin & Tischman, attorneys).
STANTON, J.C.C. (temporarily assigned).
Plaintiffs are trustees in bankruptcy of Pritchard & Baird Intermediaries Corp. (hereinafter Pritchard & Baird) and three related corporations. They have brought this action at the direction of the United States District Court for the District of New Jersey. The late Charles H. Pritchard was for many years the principal stockholder and controlling force in Pritchard & Baird. Defendant United Jersey Bank is the administrator with the will annexed of his estate. The late Lillian G. Pritchard was the wife of Charles H. Pritchard and also served for many years as a director of Pritchard & Baird. Defendant Lillian P. Overcash is the daughter of Charles H. Pritchard and Lillian G. Pritchard. Mrs. Overcash is the executrix of her mother's estate. She is being sued in that representative capacity and also individually.
At the conclusion of the trial of this case I found that Lillian G. Pritchard had been negligent in performing her duties as a director of Pritchard & Baird, and her estate was liable in the amount of $10,355,736.91, plus prejudgment interest, because of that dereliction. In addition, her estate was held liable in the amount of $33,000, plus prejudgment *360 interest, for sums improperly paid to her during her lifetime by Pritchard & Baird. The estate of Charles H. Pritchard was held liable in the amount of $357,648.17, plus prejudgment interest; for sums improperly paid to him during his lifetime by Pritchard & Baird and for sums improperly paid by Pritchard & Baird for the benefit of his estate.
Defendants have moved for a new trial or, alternatively, for an amendment to the judgment reducing its amount. This opinion is written by way of deciding that motion. It also supplements the oral opinion which I delivered at the end of the trial. I have decided that there will be no new trial and that there will be no amendment of the judgment.
Pritchard & Baird was engaged in the business of being a reinsurance broker. Along with three related corporations, it was controlled for many years by Charles H. Pritchard, who died on December 10, 1973. Prior to his death he had taken his sons, Charles, Jr. and William, into the business. During the last few years of the elder Pritchard's life the sons, particularly Charles, Jr., had played an increasingly dominant role in the affairs of Pritchard & Baird. After the father's death the sons took complete control of the business.
Charles, Jr. and William were extremely incompetent businessmen and they were almost totally devoid of any sense of self-restraint or business morality. By the end of 1975 they had plunged Pritchard and Baird and the related corporations into hopeless bankruptcy. I understand from my general knowledge of the bankruptcy proceedings which are under way in the United States District Court for the District of New Jersey that the creditors of the various businesses stand to lose something on the order of $70,000,000. This present action is part of a much larger picture of chicanery and fraud. It deals with more than $10,000,000 in funds transferred unlawfully from Pritchard & Baird to various members of the Pritchard family.
*361 In order to understand what occurred in this case it is necessary to say something about the business of being a reinsurance broker. If an insurer has a very large individual risk on which it has given coverage, it may seek to protect itself from too heavy a loss by shifting the risk to another larger insurer or to a group of insurers. It does this by reinsuring, that is, by purchasing insurance on all or a portion of the underlying risk from one or more other insurers. This approach may be taken with respect to a single very large risk or with respect to a class or category of policies in which there seems to be a dangerously high concentration of risk. An insurance company which has provided underlying coverage and seeks to spread all or part of the risk to one or more other insurers is known as a ceding company. An insurance company which sells protection to a ceding company is a reinsurer.
The function of a reinsurance broker such as Pritchard & Baird is to bring ceding companies and reinsurers together. However, the task of the reinsurance broker is much more complicated and sophisticated than that of the ordinary retail insurance broker with whom we are all familiar in our capacities as owners of automobiles or houses. Very often, scores of insurance companies are involved in a single reinsurance transaction, and it is common for reinsurance transactions to cross national boundaries. There is virtually no governmental regulation at any level of the business of reinsurance. Frequently, the ceding and reinsuring companies involved in a reinsurance transaction do not know each other's identities, and this may be true even after the transaction has been consummated, and even after a substantial loss has been incurred and paid. The insurance companies involved rely to a large extent upon the knowledge, skill, integrity and bookkeeping of the reinsurance broker.
The elder Pritchard was in the reinsurance broker's business for many years, going back to at least 1948. His base of operations was always in downtown Manhattan. He *362 organized Pritchard & Baird in 1959 under the laws of New York. Pritchard & Baird continued operations in Manhattan until shortly after 1970. In the early 1970s Charles, Jr. and William moved the corporation's operations to Morristown, New Jersey, so that their office would be closer to their homes. All, or virtually all, of the unlawful transfers involved in this case took place entirely in New Jersey after the operations had been transferred to Morristown.
All of the income of Pritchard & Baird was derived from commissions earned on reinsurance transactions. All of the funds passing through Pritchard & Baird came from premium payments being sent by ceding companies to reinsurers (out of which Pritchard & Baird was entitled to deduct a commission) or from loss payments being sent by reinsurers to ceding companies. While the elder Pritchard was in control of the brokerage corporation, the corporation commingled all funds. All payments to ceding companies, to reinsurers, and for the operations and profits of Pritchard & Baird were paid out of a single, unsegregated account. To make matters worse, Pritchard & Baird never paid the elder Pritchard funds designated as salary, or commissions, or earnings, during the course of a fiscal year. Instead, the elder Pritchard during the course of a year would take out substantial sums designated as "loans" on the books of the corporation. There were never resolutions of the board of directors authorizing these "loans," and the "loans" were never evidenced by promissory notes.
At the end of the fiscal year the accountant for Pritchard & Baird would calculate how much was paid or owing to ceding corporations with respect to transactions during the fiscal year, how much was paid or owing to reinsurers and how much was attributable to the broker's internal operations and expenses. The remainder was profit. The profit was used first to wipe out "loans" made to the elder Pritchard and the balance was then paid out to him. Abraham J. Briloff was the accountant who set up this *363 woefully inadequate and highly dangerous bookkeeping system. In deposition testimony which was introduced in evidence during the trial before me Briloff attempted to justify the system on the ground that Pritchard & Baird was a Subchapter S corporation for federal income tax purposes. Thus, for income tax purposes the corporation was treated, broadly speaking, as though it were a partnership or a sole proprietorship. This fact, according to Briloff's thinking, justified treating this brokerage corporation, which annually handled millions of dollars belonging (or, at least, owing) to other people, on about the same level of accounting sophistication as one would expect in a one-man carpenter shop.
Neither the elder Pritchard nor Briloff seem to have had the slightest idea of the wide range of sound accounting, tax, business, legal and ethical concepts which were violated by the bookkeeping and "loan" practices of Pritchard & Baird. However, in fairness to the elder Pritchard and Briloff, it must be said that while the elder Pritchard was in active day-to-day control of the business, the system, conceptually defective though it was, was used honestly. The "loans" made during the year bore a realistic relationship to reasonably anticipated profits. "Loans" were, in fact, reduced to zero or near zero at the end of each fiscal year. Ceding companies and reinsurers were paid what was owed to them. Thus, while the elder Pritchard was in day-to-day control, no great harm was done. It should also be noted that when the elder Pritchard gave up real control, Briloff also ceased to play an active role in Pritchard & Baird.
Israel M. Pogash, an accountant, testified about the financial affairs of Pritchard & Baird. He prepared a detailed written report which was received in evidence as Exhibit P-8. I have found Pogash's testimony and report to be substantially accurate and have relied heavily upon them in reaching my findings.
*364 The Pritchard sons started to plunder Pritchard & Baird during the fiscal year ending on January 31, 1970. In that year they caused Pritchard & Baird to pay to Charles, Jr. $230,932 more than he was entitled to receive by way of legitimate salary or other lawful earnings or profits. In that year they also caused the corporation to pay William $207,329 more than he was entitled to receive by way of legitimate salary or other earnings or profits. In succeeding fiscal years withdrawals under the heading of "loans" continued to be made vastly in excess of what might legitimately have been withdrawn by way of salary or other earnings or profits. By the time Pritchard & Baird filed its petition in bankruptcy on December 4, 1975, the total of excessive payments to William from the corporation amounted to $5,483,799.02 and the total of excessive payments to Charles, Jr. amounted to $4,391,133.21.
Between February 1, 1970 and the date of his death, December 10, 1973, the elder Pritchard received from Pritchard & Baird $189,194.17 more than he was entitled to receive by way of legitimate salary or other lawful earnings or profits. After the elder Pritchard's death, corporate funds of Pritchard & Baird amounting to $168,454 were improperly used to pay his federal estate taxes. All of the payments mentioned in this paragraph were designated as "loans" on the corporate books.
After the death of Charles H. Pritchard, Pritchard & Baird made periodic "loans" to his widow, Lillian G. Pritchard, totalling $33,000. Defense counsel have suggested that these payments might be treated as proper death benefit payments. It is conceivable that a proper death benefit plan might have been established under which Pritchard & Baird might lawfully have made some payments to Mrs. Pritchard. However, the fact is that no death benefit plan was ever established by appropriate corporate action, and there was not even any contemporaneous attempt to justify the payments as death benefits.
*365 Except for some clerical work which she did many years ago for the corporation, Lillian Overcash never had any connection with Pritchard & Baird. However, like most people, she could use money. The corporation met that need by making periodic payments designated as "loans" to Mrs. Overcash in the total amount of $123,156.51 between February 12, 1970 and October 14, 1975.
The payments mentioned in the four paragraphs immediately preceding this one total $10,388.736.91. Plaintiffs' basic theory in presenting this case has been that since the corporation's books show these payments as loans, they should be treated as loans and the persons to whom they were made, or their estates, should be required to repay them. (At this point it should be noted that no claims are made in this action against Charles, Jr. or William. Those men have filed individual bankruptcy petitions, and remedies against them are being sought in the course of their individual bankruptcy proceedings.) There is an attractive conceptual neatness and simplicity to this approach. Since no other terms are specified, it is clear that these payments, if they are loans, are demand loans and are payable in full whenever payment is requested. Thus, if we accept the loan conceptualization, plaintiffs would be entiled to a judgment against each defendant in the amount of the loans to each defendant or each defendant's decedent.
However, I find it difficult to justify treating these payments as loans. For one thing, there never were any resolutions of the board of directors authorizing any loans to any of the recipients of the payments. There never were any promissory notes or other evidences of indebtedness signed by any of the recipients. Mrs. Pritchard and Mrs. Overcash always thought they were getting absolute grants of money; they never had the slightest idea that they were expected to pay anything back. At all relevant times, the elder Pritchard. Charles. Jr. and William were officers and directors of Pritchard & Baird. If we treat *366 New York law as governing (because the corporation was organized under the laws of New York), it is clear that the special provisions for loans to corporate officers required under § 714 of the New York Business Corporation Law were not followed. If we treat New Jersey law as governing (because all, or virtually all, of the loans were made within New Jersey), it is clear that the special provisions for loans to corporate officers who are also directors required under N.J.S.A. 14A:6-11 were not followed. Finally, so far as Charles, Jr. and William are concerned, the "loans" were so vast in relation to their personal assets that there was never any reasonable prospect that they could be repaid. The action of the Pritchard sons in causing these payments to be designated as "loans" on the financial records of the corporation was nothing more than an attempt to avoid being guilty of simple and straightforward larceny.
With respect to the basic validity and appropriateness of the payments in question, and with respect to the legal characterization of the payments, I believe that New Jersey law should govern. At almost all relevant times the operations of Pritchard & Baird were being conducted in New Jersey. At all relevant times Charles H. Pritchard, Lillian Pritchard, Charles H. Pritchard, Jr. and William Pritchard were domiciled in New Jersey. Lillian Overcash was frequently present in New Jersey. Almost all of the payments were made in New Jersey. New Jersey has more significant relationships to the parties and to the transactions than does New York or any other state. See Restatement, Conflict of Laws 2d, § 6.
In my view, many of the problems presented in this case can best be dealt with under the rules of law governing fraudulent conveyances. The financial statement of Pritchard & Baird for the fiscal year ending January 31, 1970 showed a working capital deficit of $389,022 at the close of the year. (Exhibit P-21 in evidence). The working capital deficit grew rapidly thereafter. On January 31, 1972 it was $1,684,289. On January 31, 1973 it was *367 $3,506,460. (Exhibit P-23 in evidence). On January 31, 1974 it was $6,939,007. (Exhibit P-24 in evidence). On January 31, 1975 it was $10,176,419. (Exhibit P-22 in evidence). Since the corporation never had any significant capital assets to offset these working capital deficits, it is clear to me that Pritchard & Baird was insolvent within the meaning of the law governing fraudulent conveyances at all times after January 31, 1970. N.J.S.A. 25:2-8.
During the trial defense counsel argued that Pritchard & Baird could not have been insolvent when most of the questioned payments were made because the corporation was able to keep functioning right up to December 4, 1975. Although no testimony focused on this particular issue during the trial, it is clear to me from the general circumstances of the situation and from the inherent probabilities that Pritchard & Baird kept functioning for four or five years during which it was actually insolvent by improperly delaying payments owed to ceding companies and to reinsurers. At all times Pritchard & Baird was holding many millions of dollars belonging to (or, at least, owing to) other companies. It simply juggled the accounts of its customers and for a long period of time was able to keep them fooled about the true state of its finances and about the true state of what it owed to them and to others.
All of the payments mentioned above which were made to members of the family or for the benefit of the estate of Charles H. Pritchard were made without fair consideration. See N.J.S.A. 25:2-9. None of them could qualify as legitimate salary, earnings, dividends, profits, loans or as a lawful distribution of any kind. All of the payments were made while Pritchard & Baird was insolvent. All are fraudulent conveyances within the meaning of N.J.S.A. 25:2-10, 11 and 12 and are invalid. Furthermore, I find that Charles, Jr. and William must have had an actual intent to defraud creditors. Since they were the controlling forces in Pritchard & Baird, their intent is to be imputed to the corporation. Thus, all of the payments are also *368 fraudulent under N.J.S.A. 25:2-13, which requires actual intent to defraud. Creditors of Pritchard & Baird are entitled to have those payments set aside. Under the circumstances of this case, that means that plaintiffs, who as trustees in bankruptcy stand in the shoes of the creditors, are entitled to money judgments against the recipients of the payments in the amount of the payments. These factual issues were fully and fairly presented and litigated during the course of this trial. To the extent necessary, the pleadings shall be deemed to have been amended to cover the relief granted. R. 4:9-2.
Although I have applied New Jersey rather than New York law to this situation, I note that New York law is virtually identical in this area. New Jersey adopted the Uniform Fraudulent Conveyance Act, sections of which have been cited above, in 1919. New York adopted the Uniform Act in 1925. See New York Debtor and Creditor Law, §§ 270-281.
Mrs. Lillian G. Pritchard was a member of the board of directors of Pritchard & Baird from the time of its organization on April 1, 1959 until she resigned on December 3, 1975, the day before the corporation filed its petition in the bankruptcy court. Thus, aside from the $33,000 which she personally received, she sat as a director of Pritchard & Baird while $10,355,736.91 was unlawfully paid out by that corporation to other members of the Pritchard family. I will now deal with the question of Mrs. Pritchard's responsibility for those payments
Pritchard & Baird was incorporated under the laws of New York. As a starting proposition, one would anticipate that New York law would govern the issue of Mrs. Pritchard's responsibilities as a director. Section 309 of Restatement, Conflict of Law 2d, states the choice of law rule as follows:
The local law of the state of incorporation will be applied to determine the existence and extent of a director's or officer's liability to the corporation, its creditors and shareholders, except where, with respect to the particular issue, some other state has a more significant *369 relationship under the principles stated in § 6 to the parties and the transaction, in which event the local law of the other state will be applied.
I conclude that in this case we should follow the exception stated to § 309 rather than the basic rule stated in that section. Throughout most of the period in question the corporation conducted its basic operations in New Jersey and had no significant contact with New York, apart from the fact of its incorporation there. All shareholders of the corporation have always been New Jersey residents. Virtually all of the transactions involved took place entirely within New Jersey. All of the recipients of the payments have always been residents of New Jersey, with the possible exception of Mrs. Overcash during a portion of the time involved. The estates of Mr. and Mrs. Pritchard are being administered in New Jersey, and the bankruptcy proceedings involving the corporation and Charles, Jr. and William are being administered in the United States District Court for the District of New Jersey. Although many of the creditors are located outside New Jersey, all of them had New Jersey contacts with Pritchard & Baird. In short, New Jersey has had many more significant relationships with the parties and with the transactions involved than has New York. See Comment (c) to § 309, supra.
Directors are responsible for the general management of the affairs of a corporation. See N.J.S.A. 14A:6-1. They have particular responsibility with respect to distributions of assets to shareholders and with respect to loans to officers and directors. See N.J.S.A. 14A:6-12. It is true that in this case the directors were never asked to take explicit and formal action with respect to any of the unlawful payments made to members of the Pritchard family. I am satisfied that, in terms of her actual knowledge, Mrs. Pritchard did not know what her sons were doing to the corporation and she did not know that it was unlawful. She did not intend to cheat anyone or to defraud creditors of the corporation. *370 However, if Mrs. Pritchard had paid the slightest attention to her duties as a director, and if she had paid the slightest attention to the affairs of corporation, she would have known what was happening.
Financial statements were prepared for Pritchard & Baird every year. They were simple statements, typically no longer than three or four pages. The annual financial statements accurately and clearly reflected the payments to members of the Pritchard family, and they clearly reflected the desperate financial condition of the corporation. For example, a brief glance at the statement for the fiscal year ending on January 31, 1970 would have revealed that Charles, Jr. had withdrawn from the corporation $230,932 to which he was not entitled, and William had improperly withdrawn $207,329. (Exhibit P-21 in evidence). A brief glance at the statement for the year ending January 31, 1973 would have shown Charles, Jr. owing the corporation $1,899,288 and William owing it $1,752,318. The same statement showed a working capital deficit of $3,506,460. (Exhibit P-23 in evidence). The statement for the fiscal year ending January 31, 1975, a simple four-page document, showed Charles, Jr. owing the corporation $4,373,928, William owing $5,417,388, and a working capital deficit of $10,176,419. (Exhibit P-22 in evidence). All statements reflected the fact that the corporation had virtually no assets and that liabilities vastly exceeded assets. In short, anyone who took a brief glance at the annual statements at any time after January 31, 1970 and who had the slightest knowledge of the corporation's business activities would know that Charles, Jr. and William were, in simple and blunt terms, stealing money which should have been paid to the corporation's customers.
There are no controlling New Jersey cases in this area, and, in fact, I can find no New Jersey cases which are closely enough in point to be helpful in resolving our case. However, it seems to me that the inherent nature of a corporate director's job necessarily implies that he must *371 have a basic idea of the corporation's activities. He should know what business the corporation is in, and he should have some broad idea of the scope and range of the corporation's affairs. In terms of our case, Mrs. Pritchard should have known that Pritchard & Baird was in the reinsurance business as a broker and that it annually handled millions of dollars belonging to, or owing to, ceding companies and reinsurers. Charged with that knowledge, it seems to me that a director in Mrs. Pritchard's position had, at the bare minimum, an obligation to ask for and read the annual financial statements of the corporation. She would then have the obligation to react appropriately to what a reading of the statements revealed.
It has been urged in this case that Mrs. Pritchard should not be held responsible for what happened while she was a director of Pritchard & Baird because she was a simple housewife who served as a director as an accommodation to her husband and sons. Let me start by saying that I reject the sexism which is unintended but which is implicit in such an argument. There is no reason why the average housewife could not adequately discharge the functions of a director of a corporation such as Pritchard & Baird, despite a lack of business career experience, if she gave some reasonable attention to what she was supposed to be doing. The problem is not that Mrs. Pritchard was a simple housewife. The problem is that she was a person who took a job which necessarily entailed certain responsibilities and she then failed to make any effort whatever to discharge those responsibilities. The ultimate insult to the fundamental dignity and equality of women would be to treat a grown woman as though she were a child not responsible for her acts and omissions.
It has been argued that allowance should be made for the fact that during the last years in question Mrs. Pritchard was old, was grief-stricken at the loss of her husband, sometimes consumed too much alcohol and was psychologically overborne by her sons. I was not impressed by the *372 testimony supporting that argument. There is no proof whatever that Mrs. Pritchard ever ceased to be fully competent. There is no proof that she ever made any effort as a director to question or stop the unlawful activities of Charles, Jr. and William. The actions of the sons were so blatantly wrongful that it is hard to see how they could have resisted any moderately firm objection to what they were doing. The fact is that Mrs. Pritchard never knew what they were doing because she never made the slightest effort to discharge any of her responsibilities as a director of Pritchard & Baird.
Defense counsel have argued that Mrs. Pritchard should not be held liable because she was a mere "figurehead director," and they have relied on General Films, Inc. v. Sanco Gen'l Mfg. Corp., 153 N.J. Super. 369 (App. Div. 1977). In that case defendant corporation was a broker to whom plaintiff had advanced funds for the purchase of a specific lot of manufacturing materials. Defendant corporation placed the funds in its general corporate account. It did not complete the purchase of the materials and was financially unable to return the funds to plaintiff. Plaintiff sued the corporation, a man named Jerry Galuten who controlled the day-to-day operations of the corporation, and Sandra Galuten, his wife. Mrs. Galuten was the sole stockholder of the corporation, but she actually played no active role in its affairs. The Appellate Division held that Jerry Galuten was individually liable to plaintiff for his active participation in wrongdoing by the corporation, but it affirmed a trial court ruling holding that Mrs. Sandra Galuten was not liable. In doing so the Appellate Division said (at 371): "He [the trial judge] further held that Sandra Galuten could in no event be liable, having only been a figurehead in the corporation, not an active participant. We agree with the latter holding."
Although, as a broad abstraction, the quoted language of the General Films case seems to support the defense argument, the case does not actually support that argument. The *373 wrongdoing in General Films was an isolated transaction which spanned only a brief period of time and which had many earmarks of a perfectly legitimate business transaction. There is nothing in the case to indicate that the transaction should have attracted the attention and intervention of a reasonably diligent director who was not herself a participant in the wrongful act. That was the real reason for the nonliability of Mrs. Galuten. Talk of corporate "figureheads" is not really helpful. If a director actively participates in a wrongful diversion of corporate funds, he is liable on some intentional tort basis. If he does not actively participate in the wrongful diversion, he may or may not be liable. He is not liable merely because he is a director. He is liable if, in the exercise of due care in performing his duties as director, he should have known of the diversion and acted to stop it. In short, the issue is one of negligence. The quoted language of the General Films case is a passing remark and does not constitute controlling authority.
In legal contemplation there is no such thing as a "figurehead" director. This has been clearly recognized for many years so far as banking corporations are concerned. 3A Fletcher, Cyclopedia of the Law of Private Corporations, (rev. perm. ed. 1975), § 1090, has this to say:
It frequently happens that persons become directors of banking houses for the purpose of capitalizing the position in the community where the bank does business, without any intention of watching or participating in the conduct of its affairs. It is a dangerous practice for the director, since such figureheads and rubber stamp are universally held liable on the ground that they have not discharged their duty nor exercised the required amount of diligence exacted of them.
See Campbell v. Watson, 62 N.J. Eq. 396 (Ch. 1901). See also, Martin v. Webb, 110 U.S. 7, 3 S.Ct. 428, 28 L.Ed. 49 (1883), and Michelsen v. Penney, 135 F.2d 409 (2 Cir.1943). There is no reason why the rule stated by Fletcher should be limited to banks. Certainly, there is no reason why the rule should not be extended to a corporation *374 such as Pritchard & Baird which routinely handled millions of dollars belonging to, or owing to, other persons. For a case extending the rule to a nonbanking corporation which handled other person's money, see O'Connor v. First Nat'l Investors' Corp., 163 Va. 908, 177 S.E. 852 (Ct. App. 1935).
I hold that Mrs. Pritchard was negligent in performing her duties as a director of Pritchard & Baird. Had she performed her duties with due care, she would readily have discovered the wrongdoing of Charles, Jr. and Williams shortly after the close of the fiscal year ending on January 31, 1970, and she could easily have taken effective steps to stop the wrongdoing. Her negligence caused customers and creditors of Pritchard & Baird to suffer losses amounting to $10,355,736.91. There will be a judgment against her estate in that amount.
Although I have applied New Jersey law rather than New York law to the question of Mrs. Pritchard's liability as a director, I note my belief that the same result would have been reached under New York law. See New York Business Corporation Law § 717 which expressly requires that a director "shall perform his duties as a director * * * in good faith and with that degree of care which an ordinarily prudent person in a like position would use under similar circumstances." See also, Kavanaugh v. Gould, 223 N.Y. 103, 119 N.E. 237 (Ct. App. 1918), and Platt Corp. v. Platt, 42 Misc.2d 640, 249 N.Y.S.2d 1 (Sup. Ct. 1964), rev'd on other grounds, 17 N.Y.2d 234, 270 N.Y.S.2d 408, 217 N.E.2d 134 (Ct. App. 1966).
Finally, I note that there is another basis upon which liability could have been imposed on some or all of the defendants in this case. It was established by testimony of J. Raymond Berry, which I find to be reliable, that the universal custom in the reinsurance business is that brokers segregate funds coming from and owing to ceding companies and reinsurers and keep them separate from the broker's own funds. This accords with legally recognized rules affecting *375 other kinds of brokers. See General Films Inc. v. Sanco Gen'l Mfg. Corp., supra, 153 N.J. Super. at 372-373. Where, as in this case, failure to segregate funds is causally significant in the loss of funds, those who actively failed to segregate and those who negligently failed to require segregation are liable for the resulting losses.
Prejudgment interest will be allowed in accordance with the rules set forth in my previous oral opinion. Plaintiffs' attorneys should calculate it and set it forth in the form of judgment to be submitted. Costs to plaintiffs.