**CHEROKEE INSURANCE COMPANY, By and Through David S. WEED, Plaintiff–Appellant,**

v.

**E.W. BLANCH COMPANY, et al., Defendants–Appellees.**

No. 94–5110.

United States Court of Appeals, Sixth Circuit.

Argued March 13, 1995.

Decided Sept. 26, 1995.

William B. Hubbard (briefed), Brenner Lackey Van Meter (argued and briefed), Weed, Hubbard, Berry & Doughty, Nashville, TN, for plaintiff-appellant.

Jay S. Bowen, Bass, Berry & Sims, Nashville, TN, Daniel P. O'Keefe (argued and briefed), Dorsey & Whitney, Minneapolis, MN, for defendant-appellee E.W. Blanch Co.

Daniel P. O'Keefe, Dorsey & Whitney, Minneapolis, MN, for defendants-appellees E.W. Blanch, Jr., Andrew M. O'Brien, Clifford English and Frank S. Wilkinson, General Partners.

Before: NELSON and SUHRHEINRICH, Circuit Judges; SMITH, District Judge.*

DAVID A. NELSON, Circuit Judge.

The issue we address in this appeal is whether the defendant, a reinsurance broker, was entitled to judgment as a matter of law on a claim that it failed to exercise due care in examining the financial strength of certain reinsurers it recommended to the plaintiff insurance company. On cross-motions for summary judgment, the district court resolved this issue in favor of the defendant. We conclude, upon *de novo* review, that the district court reached the correct result. The judgment entered in favor of the defendant will be affirmed.

## I

The plaintiff, Cherokee Insurance Company, is a property and casualty insurer incorporated in Tennessee and based in that state. Cherokee was placed in "rehabilitation" (a form of receivership) in July of 1984, after the company encountered problems with its "assumed" reinsurance business—a line of business in which Cherokee itself acted as a reinsurer.[1] The present lawsuit was filed in June of 1990, at which time Cherokee was still acting by and through David S. Weed as "Special Deputy Commissioner of Commerce and Insurance for the Rehabilitation of Cher-

---

* The Honorable George C. Smith, United States District Judge for the Southern District of Ohio, sitting by designation.

1. Where an insurer obtains reinsurance by ceding a portion of its risk to a reinsurer, the company providing the reinsurance is referred to as the "assuming" company. Cherokee retained only a small part of its assumed reinsurance, passing the bulk of the business on to "retroces-sionaires," or reinsurers of reinsurers. Cherokee's main retrocessionaire—which, like most of Cherokee's retrocessionaires, was an off-shore company—is said to have stopped fulfilling its obligations late in 1983. The defendant was not involved in the selection of Cherokee's retrocessionaires and is not claimed to have been responsible for Cherokee's going into rehabilitation.

okee Insurance Company." (Mr. Weed is also a member of the law firm that represents Cherokee herein.) The action was brought in the Chancery Court for Davidson County, Tennessee.

Named as defendants were E.W. Blanch Company, a Delaware partnership, and several individuals identified as general partners of the firm. We shall refer to the partnership and the defendant partners collectively as "Blanch" or "the defendant."

Cherokee's complaint alleged, among other things, that Blanch had served as Cherokee's principal reinsurance "intermediary," or broker, pursuant to an unwritten contract; that Blanch negotiated arrangements under which Cherokee ceded to various reinsurers some of the risk on insurance policies it had written; that Blanch owed Cherokee a duty to exercise reasonable prudence, diligence and care in selecting financially sound reinsurers and in monitoring their financial stability; that among the reinsurers with which Blanch placed business for Cherokee were five companies that proved to be financially unsound; that Blanch was negligent in the selection of these companies; and that Cherokee suffered damages of approximately $2.5 million as a result of such negligence.[2]

Blanch removed the case to federal court on diversity grounds pursuant to 28 U.S.C. § 1441. Soon thereafter Blanch filed an answer in which, among other things, it admitted that it had functioned as the intermediary on reinsurance matters involving Cherokee; denied the existence of any contractual arrangement regarding the subject matter of the action; denied having been under the alleged duty of care or having broken any such duty; and asserted a variety of affirmative defenses, including ratification of and/or consent to the conduct complained of, contributory negligence, assumption of the risk, and waiver.

Blanch moved for summary judgment in March of 1991. Six months later Cherokee moved for summary judgment as to liability. In February of 1992 a magistrate judge issued a report and recommendation in which he recommended that Blanch's motion for summary judgment be granted in part and denied in part. Both sides moved for reconsideration, expanding the record in the process. In a report and recommendation issued in February of 1993 the magistrate judge recommended allowing Cherokee to drop its claims as to the two solvent reinsurers; denying Cherokee's motion for summary judgment and motion for reconsideration; granting Blanch's motion for reconsideration; and entering summary judgment in favor of Blanch as to all of Cherokee's claims against it. The district court adopted these recommendations, without change, in an order entered on December 20, 1993. This appeal followed.

II

The factual picture that emerges from the rather massive record compiled by the parties may be outlined broadly as follows.

Cherokee relied on several intermediaries to obtain reinsurance for it, but Blanch was its principal reinsurance intermediary until 1984. Representatives of Blanch would visit Cherokee annually to analyze the company's reinsurance needs for the coming year. Blanch would then work out an agreed reinsurance program with Cherokee, circulate a description of the program to potential reinsurers, and advise Cherokee of the companies with which it proposed to place reinsurance. Blanch typically told Cherokee that the reinsurers it was proposing appeared to

---

2. In September of 1992 Cherokee moved for leave to amend its complaint by dropping all claims against Blanch with respect to two of the five reinsurers. (The motion said that evidence surfacing since the filing of the complaint showed that the two reinsurers were solvent— "and, therefore, Blanch cannot be held negligent in the placement of Cherokee's business with these two reinsurers.") In June of 1993 Cherokee moved for leave to supplement the complaint by increasing its claim of damages with respect

to one of the remaining reinsurers. The net amount of damages claimed after these adjustments comes to approximately $1.4 million, exclusive of punitive damages. The individual reinsurance companies involved, and the estimated losses associated with each, are as follows:

— Mutual Fire Marine and Inland Insurance Co., $558,357.47;
— Transit Casualty Co., $529,750.00; and
— Mission Insurance Co., $307,287.00.

offer "good" or "acceptable" security, but Cherokee would be asked to contact Blanch with any questions or comments it might have. Cherokee's silence was assumed to mean approval. Blanch would negotiate reinsurance contracts (or "treaties") with companies participating in the program and would submit contracts signed by such companies for signature by Cherokee.

Blanch's compensation for its services came not from Cherokee, but from commissions on the insurance ceded by Cherokee. Blanch viewed Cherokee as its client, however, and it is clear that Blanch considered itself to be working for Cherokee, not for the reinsurers.

In a promotional brochure circulated to clients (including Cherokee) at the end of the 1970s, Blanch described its role as an "all-encompassing" one that included "providing sound counsel, designing and negotiating reinsurance programs, and placing reinsurance with strong, responsive reinsurance markets." (In this context, a "reinsurance market" means an individual reinsurer.) The brochure went on to say that "[t]hese programs are monitored on a continuous basis with subsequent recommendations for changes which not only reflect clients' needs but also reflect availability of new coverages in the reinsurance marketplace."

Blanch monitored the financial strength of individual reinsurers through an internal committee called the Market Security Committee. This committee maintained a confidential list of approved reinsurers that Blanch employees could routinely propose to clients.

In determining whether to place a reinsurer on its approved list during the time period relevant here (1980 to 1984), the committee considered a number of factors commonly used and relied on within the industry. These factors included the rating assigned to the reinsurer by A.M. Best Company, a prominent insurance company rating service; the size of the reinsurer, as measured by its policyholder surplus; "early warning" data involving some eleven financial ratios (subsequently called "IRIS ratios," the acronym standing for Insurance Regulatory Information System) developed by the National Association of Insurance Commissioners; the reinsurer's annual reports; and the reputation of the reinsurer's staff.

The three reinsurers named in footnote 2, *supra*—Mutual Fire, Transit Casualty, and Mission Insurance—qualified for inclusion in Blanch's approved list during the early 1980s. Each of the three carried an "A +" (superior) or "A" (excellent) rating from A.M. Best. Each was of a size that met Blanch's established criteria. Each passed the IRIS tests administered annually by state regulatory authorities. Each issued annual reports that set off no alarm bells with the regulatory authorities. None of the three companies, as far as the record discloses, had a reputation for management competence that was anything other than favorable.

Cherokee, whose own staff included qualified professionals capable of forming judgments in this area, raised no question as to the inclusion of any of the three reinsurers in Cherokee's program. In October of 1985, however, Mission Insurance Company was placed under conservatorship. (This happened almost two years after Cherokee's last purchase of reinsurance from Mission.) Transit Casualty and Mutual Fire subsequently went the same route. It is undisputed that all three companies defaulted on their reinsurance obligations to Cherokee.

In attempting to develop support for its claim that Blanch had been negligent in placing these companies on Cherokee's reinsurance treaties, Cherokee engaged Bernard L. Webb as an expert witness. Mr. Webb, who was a teacher at Georgia State University for most of his career, is a Fellow of the Casualty Actuarial Society, a Chartered Property and Casualty Underwriter, and the author of various books and articles on insurance subjects.

In a deposition given in June of 1992, and in three affidavits executed between September of 1991 and September of 1992, Mr. Webb described an in-depth analysis he performed on the annual financial statements of the five reinsurers as to which Blanch was originally claimed to have been negligent. Although he did not assert that any of the companies was insolvent when Blanch placed

reinsurance with it, Mr. Webb maintained—using his analysis as the standard—that Blanch should have known that the five companies were financially troubled and represented poor security.

Mr. Webb's standard entailed the use of six different financial ratios: the ratio to policyholders' surplus of (1) ceding commissions (a measure of the company's dependence on reinsurers); (2) investment in subsidiaries and affiliates; (3) reinsurance recoverables from affiliates; (4) reinsurance recoverables from non-affiliates; (5) total reinsurance recoverables; and (6) balances due the company from its agents. Mr. Webb assigned a specified pass-fail benchmark to each ratio. If more than 75 percent of the policyholders' surplus was represented by reinsurance recoverables, for example, Mr. Webb expressed the opinion that a review of the quality of the retrocessionaires would be indicated. If more than 50 percent of the surplus was represented by investments in subsidiaries, similarly, he opined that the actual value of the subsidiaries should be examined. Blanch did not perform this type of analysis.

Neither, as far as the record discloses, did any other reinsurance broker in the industry. Mr. Webb, who had never been a broker himself and had never worked for one, claimed no expertise as to industry practice. He could not identify any brokerage firm that was doing the type of analysis he advocated, and he acknowledged that he did not hold himself out as an expert on the customs and practices of reinsurance brokers during 1980 to 1984.

Mr. Webb could not say, similarly, that any of the ratios employed in his analysis did, in fact, signal an actual cause of the failure of any of the reinsurers in question. He was not retained, he said, to perform a detailed study of why the companies failed, and he did not know whether any of them had failed because of undue dependence on insolvent reinsurers. He could not say, similarly, what the result would have been if further investigation had been conducted into the areas where he said there were warning signals. That too, he testified, was not a part of his assignment.

Mr. Webb did say, however, that he had made some attempt to search the literature for references to Mutual Fire *et al.* during the 1980–84 time period. He testified that he found nothing in the literature that reflected adversely on the financial strength of these companies. He further testified that he was aware of no one in the entire insurance industry who was predicting future financial trouble for any of the companies.

Speaking of the financial ratios he had used in his analysis of the failed reinsurers, Mr. Webb stated in his final affidavit that "I have never held my ratios out as predictors of insolvency." The affidavit went on to state that no single group of ratios can predict insolvency, and "I do not ... purport to have developed a test for predicting the failure of insurance or reinsurance companies."

This particular affidavit was filed in response to one provided by Leo T. Heifetz, a senior vice president of E.W. Blanch Company and a sometime chairman of its Market Security Committee. The Heifetz affidavit said that to test the predictive value of Mr. Webb's ratios, Blanch had run the ratios on the 1984 financial data of the nearly 2000 insurance companies in Blanch's computer data base. These companies included 20 property/casualty insurance companies that became insolvent after 1984. The exercise showed, according to Mr. Heifetz, that the Webb ratios were not a valid indicator of insolvencies:

"For example, we found that nearly one-half of the companies, or 984 of the total of 1988 companies, failed one or more of the six Webb ratios. Of those 984 companies, only 14, or less than two percent, subsequently went insolvent. Six, or 30%, of the twenty insolvent companies passed all six Webb ratios. The 970 solvent companies that failed one or more of Webb's ratios included many prominent and sound insurance companies, such as St. Paul, Cigna, Hartford, Aetna, and Crum & Forster insurance companies, and also included many of the best reinsurance companies, such as Kemper Re and Constitution Re."

Mr. Webb did not challenge the accuracy of these assertions.

The Heifetz affidavit also discussed a document prepared by another reinsurance intermediary, Guy L. Carpenter & Company, in which that company described the factors it reviewed in assessing the financial strength of reinsurers with which it placed business for clients.[3] Mr. Heifetz made a detailed showing—also unrefuted by Mr. Webb—that the factors considered by Guy L. Carpenter in reviewing reinsurers were comparable to the factors considered by Blanch's Market Security Committee. And "I am not aware," Mr. Heifetz said, "of any other reinsurance broker, including Guy Carpenter, that excluded [the reinsurers at issue here] from their approved lists during the 1980–1984 time period."

The Heifetz affidavit says that the entire industry relied heavily on state insurance regulators and the A.M. Best Company to review and analyze the financial condition of insurance companies in depth. "During the 1980–84 time period," Mr. Heifetz stated, "both A.M. Best Co. and the state regulators reported that Mission, Transit, and Mutual Fire were viable companies."

The magistrate judge, adopting a factual summary offered by Blanch, said that the undisputed facts during the relevant time period were:

"(1) [T]hat each reinsurer was duly licensed and thus deemed solvent by state regulators.

(2) [T]hat these reinsurers were all highly rated by A.M. Best Co., the premier rating service for insurance companies.

(3) [T]hat each of the three companies passed the National Association of Insurance Commissioners (NAIC) Early Warning system—IRIS test, designed to spot potential insolvencies.

(4) [T]hat the entire industry—regulators, rating services, other insurance companies, auditors and brokers—believed each of [these] three companies to represent sound security during the 1980–1984 time period."

Our own review of the record confirms the accuracy of this summary.

### III

Blanch argues that Cherokee itself had a duty to analyze the financial strength of its reinsurers; that Blanch never accepted a delegation of this duty; and that because it never assumed the duty, Blanch could not be liable for any failure to exercise due care in carrying it out. For purposes of this opinion, however, we shall assume that, as Cherokee contends, Blanch was under a duty to exercise reasonable care in selecting the reinsurers it recommended to its clients.

■ Although Cherokee does not contest the general rule that, as stated in *Higginbotham & Associates v. Greer*, 738 S.W.2d 45, 46 (Tex.App.1987), an insurance broker "is not a guarantor of the financial condition or solvency of the company from which [the broker] obtains the insurance," Cherokee contends that there are genuine issues of material fact as to whether Blanch violated its duty of care.[4] Citing *Francis v. United Jersey Bank*, 162 N.J.Super. 355, 392 A.2d 1233, 1236 (1978), aff'd, 171 N.J.Super. 34, 407 A.2d 1253 (App.Div.1979), aff'd, 87 N.J. 15, 432 A.2d 814 (1981), for the proposition that "the task of the reinsurance broker is much more complicated and sophisticated than that of the ordinary retail insurance broker," Cherokee insists that "the views and

---

3. The Guy L. Carpenter document began with a warning that reinsurance intermediaries are not guarantors, but acknowledged that they are responsible for using good judgment:

"As reinsurance intermediaries, we are not, of course, in a position to guarantee the security of any reinsurer; however, we do fully recognize our responsibilities to assist our clients by using good judgment in carefully reviewing each of the reinsurance markets with which we place business to be as certain as possible that they meet our clients' requirements."

4. The filing of Cherokee's motion for summary judgment does not preclude Cherokee from contending that there are issues of fact which preclude the granting of summary judgment to Blanch.

"The fact that both parties make motions for summary judgment, and each contends in support of his respective motion that no genuine issue of fact exists, does not require the Court to rule that no fact issue exists." *Begnaud v. White*, 170 F.2d 323, 327 (6th Cir.1948).
*Taft Broadcasting Co. v. United States*, 929 F.2d 240, 248 (6th Cir.1991), is to the same effect.

beliefs of Guy Carpenter, Bernard Webb and the available trade press on the subject of the security analysis to be performed by the prudent reinsurance intermediary create a material factual dispute."

■ Nothing that we have seen in the Guy Carpenter document, the Bernard Webb testimony, or the trade press can fairly be said to support the proposition that the analysis performed by Blanch fell short of what other reinsurance brokers were customarily doing in the 1980–84 time period. As the magistrate judge correctly noted, Mr. Heifetz attested "without dispute" that the factors set forth in the Carpenter document were identical or very similar to the information reviewed by Blanch's Market Security Committee. Mr. Webb could not say that Blanch's work was deficient by comparison to what other reinsurance brokers were doing, because he did not know what other brokers were doing. And Cherokee's reference to "the available trade press" seems to be little more than a rhetorical flourish; the record does contain a 1980 article suggesting that reinsurance brokers had a significant role to play in monitoring the financial integrity of reinsurers, but the article is couched in broad generalities and does not discuss the methods of analysis customarily used.

A report issued in 1990 by the Subcommittee on Oversight and Investigation of the Committee on Energy and Commerce of the United States House of Representatives—a subcommittee chaired by Congressman John Dingell—says that Mission Insurance Company failed in part because of its excessive reliance on reinsurance, poor underwriting, severe underpricing, inadequate reserving, accounting gimmicks, and false reporting. The subcommittee claimed to have found several types of fraudulent activity at Mission. And the subcommittee said of Transit that "its levels of management incompetence, excessive reinsurance, and reckless expansion ... equal or exceed those observed at Mission...."

Cherokee points to the Dingell Committee report as suggesting that the problems of Mission and Transit were "easily detectable by the insurance and reinsurance communities during the 1980 to 1984 time frame." The record of this case contains no significant evidence, however, that anyone in the insurance or reinsurance communities did in fact detect these problems during the time frame relevant here.[5] We conclude that there is no material issue of fact as to whether Blanch failed to comply with customary industry standards when it placed Mutual Fire *et al.* on its approved list and used them as reinsurers for Cherokee.

While conformity with customary practice is evidence of reasonable care, however, it is not necessarily conclusive evidence. As Judge Learned Hand observed in *The T.J. Hooper*, 60 F.2d 737, 740 (2d Cir.), *cert. denied*, 287 U.S. 662, 53 S.Ct. 220, 77 L.Ed. 571 (1932), an admiralty case involving ocean-going tugs that as late as 1928 were not equipped with radios to receive storm warnings, "there are precautions so imperative that even their universal disregard will not excuse their omission." *Cf.* Restatement (Second) Torts, § 295A. Tennessee, the substantive law of which is controlling here, recognizes this principle. See *Easterly v. Advance Stores Co., Inc.*, 432 F.Supp. 7, 9 (E.D.Tenn.1976) (marshalling Tennessee cases).

Could a jury, instructed in accordance with Tennessee law, be permitted to find that even though defendant Blanch acted in accordance with practices customary in the industry at the time, Blanch was negligent in failing to perform the type of detailed analysis performed by Mr. Webb some years later? The better answer, we think, is "no."

It is far from clear, for one thing, that use of the type of analysis performed by Mr. Webb was "imperative," to borrow Judge Hand's word, in the sense that the use of radios on ocean-going tugs was imperative.

---

**5.** "The alleged negligence of the defendant [reinsurance broker] must be considered in light of his knowledge at the time the policy was issued, and not at the time of the loss and failure to pay the claim." *Master Plumbers Limited Mutual Liability Company v. Cormany & Bird, Inc.*, 79 Wis.2d 308, 255 N.W.2d 533, 535 (1977). Reinsurance brokers, moreover, have no authority to audit the books of reinsurance markets, and can hardly be expected to detect false reporting or other fraudulent activity.

The importance of radios was readily apparent, in Judge Hand's case, and the masters of the vessels involved in that case actually had their own private radios on board, although they were not in working order. The use of radios had not yet become general, but some crews carried them and one carrier equipped all its tugs with the devices. The importance of an analysis such as that advocated by Mr. Webb was far less obvious, in the early 1980s, than the importance of radios was in 1928.

Insofar as some such analysis as Mr. Webb's might be considered to have been imperative, moreover, Blanch had no reason to doubt that it was being performed by state regulators—armed with investigatory powers not available to private brokers—and by the A.M. Best Company. Cherokee argues that the financial strength of a reinsurer's retrocessionaires is obviously important, but the record makes it clear that A.M. Best attempted to analyze this factor. We are not persuaded that it would be open to a jury to find that the entire brokerage industry was negligent in relying on the rating service to evaluate retrocessionaires.

**AFFIRMED.**