J. Hermon McLear, as Director and Officer of McLear Mines, Inc., Respondent, v. Clara McLear and Herbert G. McLear, Appellants, et al., Defendants.

Third Department, March 3, 1943.

*Alfred J. Conforti (Ellis J. Staley* of counsel), for appellant Clara McLear.

*Herbert G. McLear,* attorney in person (*Ellis J. Staley* of counsel), for appellant Herbert G. McLear.

*Arthur B. Hart (Albert Jakobson* and *Benedict S. Rosenfeld* of counsel), for respondent.

HILL, P. J. Appeal by defendants Herbert G. and Clara McLear from orders denying their motions to dismiss the complaint, and for summary judgment under rule 113 of the Rules of Civil Practice.

The plaintiff (hereafter Hermon) is a brother of defendant Herbert G. McLear (hereafter Herbert). Defendant Clara McLear (hereafter Clara) is the wife of the latter. Defendant McLear Mines, Inc. (hereafter Corporation) has an issue of six hundred shares of stock, three hundred belonging to Herbert, an equal amount belonging either to Hermon or his wife, all

entirely under his control. The Universal Exploration Company (hereafter Universal) is owned entirely outside the McLear family, and is the sub-lessee from the Corporation of mineral rights under a lease dated August 6, 1938, wherein the lessee agrees to pay to the lessor $600 per month from the date of the lease to October 1, 1939, at which time the monthly payment was increased to $1,000 a month, which in turn will, on October 1, 1945, be increased to $2,000 a month.

The subject-matter of this suit is the mineral rights connected with 139.92 acres of land in the town of Edwards, St. Lawrence County, N. Y. The McLears first became interested in this property October 17, 1916, when three trustees (hereafter Rhoades trustees) gave a lease to the Dominion Company (its corporate name having been since changed to McLear Mines, Inc.) of " the mines and minerals in, under and upon " the 139 plus acres of land, " together with the right to dig, quarry and mine the same and the right to sell and remove from said premises as large a quantity of the minerals therein as the lessee may desire " during the existence of the lease. This lease was for a term of twenty years with the right to renew for a like period. The lessee Corporation was to pay seventy-five cents a ton for minerals removed from the premises with a minimum of $999 for the year beginning December 1, 1916. For the next year the minimum was $1,500, and during the life of the lease after December 1, 1918, $2,000 per year. On September 29, 1932, Clara took an assignment of the lease from the Rhoades trustees and on July 10, 1933, she received a deed from the trustees, in consideration of $5,000 and a purchase-money mortgage of like amount. At the time the deed was given the Corporation was indebted for more than $12,000 royalties to the Rhoades trustees. This claim was transferred to Clara and she cancelled it. On November 6, 1937, a lease of the mineral rights running to July 31, 1957, was executed by Clara as owner and on behalf of the Corporation by Hermon as vice-president and Herbert as president. It contained substantially the same terms as the lease made with the Rhoades trustees. It provided for the payment of royalties from the date of the deed at $2,000 a year, the same amount reserved in the Rhoades lease. Later Clara consented to accept a current payment of $50 a month, the balance to be permitted to accumulate until the finances of the Corporation had improved.

Hermon in his complaint pleads and urges that the deed of July, 1933, to Clara was for the benefit of the Corporation, and asks that Herbert and Clara be adjudged to hold the title in

trust for the Corporation, to be reimbursed from its funds. In late 1937 or 1938, the financial outlook of the Corporation, which had been extremely dark, took on a brighter hue, because of negotiations with Jennings who acted on behalf of Universal. This culminated in the contract of August 6, 1938, earlier mentioned, under which the Corporation or its creditors were to receive on its behalf $600 a month for a year, and thereafter $1,000 a month until October 1, 1945, when, if the lease was continued, the payment was to be $2,000 a month. This lease may be cancelled at any time.

The affidavits of Hermon and Herbert disclose correspondence concerning a purchase of the fee to the mineral rights by the Corporation prior to the deed to Clara. Herbert wrote Hermon that the property could be purchased for $10,000 and inquired if the latter would be interested, who responded, " if we can find a way to finance the purchase of the Rhoades property at a price of $10,000 we should do so. Money is simply out of the question here." At once Herbert again wrote that the trustees, like every one else at that time, were interested only in cash, but he believed that an arrangement could be made to purchase with a down payment of $5,000 and a mortgage for a like amount, payable in three years, and asked, " are you willing to put up $2,500 cash? " Hermon asserts that at that time he was penniless and financially irresponsible, and that he suggested to Herbert that the entire cash balance in the treasury of the Corporation be applied which, together with a hoped-for payment to the Corporation, would make the aggregate about $4,000, and that an attempt be made to have the Rhoades trustees take a $6,000 mortgage. Herbert declined to have all the money of the Corporation used because of the necessity of paying current bills and the royalty as they accrued and in September, 1933, he wrote Hermon that Clara had purchased the property. The letter states: " Dependent upon circumstances, she is willing to continue the acceptance of payments of $150 each three months on account of the royalties, in accordance with the practice we have heretofore followed with the Rhoades trustees." Hermon asserted that the property should have been purchased for the Corporation, but made no offer to assume any personal obligation which would be enforceable or to advance any money. He knew of the purchase by his sister-in-law at all times after November, 1933, and had been given an opportunity to have the Corporation acquire the property at the price paid by Clara. The refusal by Herbert to use all of the cash belonging to the Corporation (only a little over $3,000)

was not unreasonable. It was needed to pay royalties and current bills and it is plain that if the Corporation had no funds Herbert would have to pay the royalties from his own funds, as Hermon had no money. Until mid-1937 the Corporation had little income, and there was small prospect of improvement. This was changed somewhat by the Universal lease. By numerout acts, Hermon recognized the ownership in Clara prior to the Universal transaction. In his affidavit, he epitomizes his position: '' I was compelled to choose the lesser of two evils. It should be borne in mind that Clara had already acquired the lease and fee at this time, namely, April, 1937. I was compelled to decide:

'' (a) whether or not it would be better to recognize Clara temporarily, and thus conclude our negotiations with ' Universal ' (U. S. Steel) and thereby obtain as a lessee one of the most financially responsible corporations which is also the largest consumer of zinc in the world, or,

'' (b) denounce Clara as owner, begin this action and jeopardize the corporation's rights (my brother's and mine) in obtaining the ' Universal ' as a tenant, and thus lose the chance to realize the fruits of our labors. My ' brother ' had threatened on numerous occasions, as repeatedly alleged herein, to discontinue all negotiations with the Universal, unless I first recognized Clara as owner.

'' My judgment dictated that I choose the first course.''

All of Hermon's asserted rights to an accounting and for other equitable relief must find their support, if at all, upon the purchase of the property by Clara. Hermon and Herbert each had large claims against the Corporation for unpaid salaries. In addition, the Corporation was indebted to Herbert for sizeable loans. It is asserted by Hermon that Herbert is the real owner of the property, and that Clara was a dummy. This is denied, but if it is assumed to be true, it is difficult to find legal wrong or even bad faith. Hermon was fully advised of the terms and price at which the purchase could be made, and was given an opportunity to advance funds equally with Herbert to permit the Corporation to purchase. His lack of funds did not create an obligation on behalf of Herbert or Clara to make advancements. He, dealing at arms length with the Rhoades trustees, entered into the lease of 1916. During all the period to 1933 the mining venture had been unprofitable. The hope of future profits could only be realized if the lease was continued. An accumulation of unpaid royalties in excess of $12,000 might well give rise, as asserted by Herbert, to res-

tiveness on behalf of the lessors. Hermon suffered no wrong when Herbert or Clara acquired the fee and became the lessor. There was no disadvantageous change in the lease, either as to the Corporation or Hermon. The fact that Herbert was in a more favorable financial position than Hermon created no obligation to loan or give money. In the complaint and in the affidavits are many assertions of unbrotherly conduct and that actions were inspired by unworthy motives, but the only facts involve this purchase by Clara of the lease and later of the fee of the 139 acres.

Herbert as a director of the Corporation should have taken the same care of its property that a man of average prudence takes of his own property. (*Hun* v. *Cary,* 82 N. Y. 65; *Bosworth* v. *Allen,* 168 N. Y. 157; *General Rubber Co.* v. *Benedict,* 215 N. Y. 18.) This standard would not make it incumbent upon him to advance his personal funds for this mining venture with its unsatisfactory financial history.

Hermon had written notice in 1933 that Clara had acquired the fee, and thereafter, as an officer of the Corporation, and personally, recognized her title by many acts, including a request that she renew the lease with the Corporation. The value of his interest as a stockholder was enhanced by the cancellation of the unpaid royalties up to 1933. As stated in his affidavit earlier quoted, in April, 1937, he decided " to recognize Clara temporarily." By these acts he ratified and approved the transaction. He is now estopped from withdrawing his earlier approval. " Where a person wronged is silent under a duty to speak, or by an act or declaration recognizes the wrong as an existing and valid transaction, and in some degree, at least, gives it effect so as to benefit himself * * * he acquiesces in and assents to it and is equitably estopped from impeaching it." (*Rothschild* v. *Title Guarantee & Trust Co.,* 204 N. Y. 458, 461.)

In passing upon the application of the Statute of Limitations, we will overlook for the moment the fact that the Corporation was not financially able to purchase the property and Hermon could not, or would not, make advancements equal to those which Herbert offered to make to permit the Corporation to make the purchase, and assume that some cause of action came into being. The only financial loss which under any circumstances the Corporation could have suffered is the difference between the value of the fee acquired by Clara and the price which she paid. Assuming that she was her husband's dummy, his gain did not exceed the correlated loss suffered by the Corporation

and an accounting is not necessary. A six-year Statute of Limitations applies. This transaction took place in 1933, and Hermon learned of it in that year. The action was not brought until 1941. (*Dunlop's Sons, Inc.,* v. *Spurr,* 285 N. Y. 333; *Potter* v. *Walker,* 276 N. Y. 15; *Corash* v. *Texas Co.,* 264 App. Div. 292.) The orders should be reversed on the law and facts and the motions granted.

BLISS, HEFFERNAN and SCHENCK, JJ., concur; CRAPSER, J., dissents, and votes to affirm the orders appealed from upon the ground that there are so many misstatements and cross-statements in the papers that a trial should be had and an opportunity to cross-examine should be given.

Orders denying motions for summary judgment reversed on the law with costs and motions for summary judgment granted. [See amended decision 266 App. Div. 702.]