JOHN J. FRANCIS, HUGH P. FRANCIS AND J. RAYMOND BERRY, TRUSTEES OF PRITCHARD & BAIRD INTERMEDIARIES CORP., PRITCHARD & BAIRD, INC., P & B INTERMEDIARIES CORP., AND P & B, INC., PLAINTIFFS-RESPONDENTS, v. UNITED JERSEY BANK, ADMINISTRATOR OF THE ESTATE OF CHARLES H. PRITCHARD, LILLIAN P. OVERCASH, EXECUTRIX OF THE ESTATE OF LILLIAN G. PRITCHARD AND LILLIAN P. OVERCASH, DEFENDANTS-APPELLANTS.

Argued May 5, 1980—Decided July 1, 1981.

*Clive S. Cummis* argued the cause for appellants (*Sills, Beck, Cummis, Radin & Tischman,* attorneys; *Thomas J. Demski,* of counsel; *Thomas J. Demski* and *Kenneth F. Oettle,* on the brief).

*Hugh P. Francis* argued the cause for respondents (*Francis and Berry,* attorneys).

The opinion of the Court was delivered by

POLLOCK, J.

The primary issue on this appeal is whether a corporate director is personally liable in negligence for the failure to prevent the misappropriation of trust funds by other directors who were also officers and shareholders of the corporation.

Plaintiffs are trustees in bankruptcy of Pritchard & Baird Intermediaries Corp. (Pritchard & Baird), a reinsurance broker or intermediary. Defendant Lillian P. Overcash is the daughter of Lillian G. Pritchard and the executrix of her estate. At the time of her death, Mrs. Pritchard was a director and the largest single shareholder of Pritchard & Baird. Because Mrs. Pritchard died after the institution of suit but before trial, her executrix was substituted as a defendant. United Jersey Bank is joined as the administrator of the estate of Charles Pritchard, Sr., who had been president, director and majority shareholder of Pritchard & Baird.

This litigation focuses on payments made by Pritchard & Baird to Charles Pritchard, Jr. and William Pritchard, who were

sons of Mr. and Mrs. Charles Pritchard, Sr., as well as officers, directors and shareholders of the corporation. Claims against Charles, Jr. and William are being pursued in bankruptcy proceedings against them.

The trial court, sitting without a jury, characterized the payments as fraudulent conveyances within *N.J.S.A.* 25:2–10 and entered judgment of $10,355,736.91 plus interest against the estate of Mrs. Pritchard. 162 *N.J.Super.* 355 (Law Div. 1978). The judgment includes damages from her negligence in permitting payments from the corporation of $4,391,133.21 to Charles, Jr. and $5,483,799.02 to William. The trial court also entered judgment for payments of other sums plus interest: (1) against the estate of Lillian Pritchard for $33,000 accepted by her during her lifetime; (2) against the estate of Charles Pritchard, Sr. for $189,194.17 paid to him during his lifetime and $168,454 for payment of taxes on his estate; and (3) against Lillian Overcash individually for $123,156.51 for payments to her.

The Appellate Division affirmed, but found that the payments were a conversion of trust funds, rather than fraudulent conveyances of the assets of the corporation. 171 *N.J.Super.* 34 (1979). We granted certification limited to the issue of the liability of Lillian Pritchard as a director. 82 *N.J.* 285 (1980).

Although we accept the characterization of the payments as a conversion of trust funds, the critical question is not whether the misconduct of Charles, Jr. and William should be characterized as fraudulent conveyances or acts of conversion. Rather, the initial question is whether Mrs. Pritchard was negligent in not noticing and trying to prevent the misappropriation of funds held by the corporation in an implied trust. A further question is whether her negligence was the proximate cause of the plaintiffs' losses. Both lower courts found that she was liable in negligence for the losses caused by the wrongdoing of Charles, Jr. and William. We affirm.

## I

The matrix for our decision is the customs and practices of the reinsurance industry and the role of Pritchard & Baird as a reinsurance broker. Reinsurance involves a contract under which one insurer agrees to indemnify another for loss sustained under the latter's policy of insurance. Insurance companies that insure against losses arising out of fire or other casualty seek at times to minimize their exposure by sharing risks with other insurance companies. Thus, when the face amount of a policy is comparatively large, the company may enlist one or more insurers to participate in that risk. Similarly, an insurance company's loss potential and overall exposure may be reduced by reinsuring a part of an entire class of policies (e. g., 25% of all of its fire insurance policies). The selling insurance company is known as a ceding company. The entity that assumes the obligation is designated as the reinsurer.

The reinsurance broker arranges the contract between the ceding company and the reinsurer. In accordance with industry custom before the Pritchard & Baird bankruptcy, the reinsurance contract or treaty did not specify the rights and duties of the broker. Typically, the ceding company communicates to the broker the details concerning the risk. The broker negotiates the sale of portions of the risk to the reinsurers. In most instances, the ceding company and the reinsurer do not communicate with each other, but rely upon the reinsurance broker. The ceding company pays premiums due a reinsurer to the broker, who deducts his commission and transmits the balance to the appropriate reinsurer. When a loss occurs, a reinsurer pays money due a ceding company to the broker, who then transmits it to the ceding company.

The reinsurance business was described by an expert at trial as having "a magic aura around it of dignity and quality and integrity." A telephone call which might be confirmed by a handwritten memorandum is sufficient to create a reinsurance obligation. Though separate bank accounts are not maintained

for each treaty, the industry practice is to segregate the insurance funds from the broker's general accounts. Thus, the insurance fund accounts would contain the identifiable amounts for transmittal to either the reinsurer or the ceder. The expert stated that in general three kinds of checks may be drawn on this account: checks payable to reinsurers as premiums, checks payable to ceders as loss payments and checks payable to the brokers as commissions.

Messrs. Pritchard and Baird initially operated as a partnership. Later they formed several corporate entities to carry on their brokerage activities. The proofs supporting the judgment relate only to one corporation, Pritchard & Baird Intermediaries Corp. (Pritchard & Baird), and we need consider only its activities. When incorporated under the laws of the State of New York in 1959, Pritchard & Baird had five directors: Charles Pritchard, Sr., his wife Lillian Pritchard, their son Charles Pritchard, Jr., George Baird and his wife Marjorie. William Pritchard, another son, became director in 1960. Upon its formation, Pritchard & Baird acquired all the assets and assumed all the liabilities of the Pritchard & Baird partnership. The corporation issued 200 shares of common stock. Charles Pritchard, Sr. acquired 120 shares, his sons Charles Pritchard, Jr., 15 and William, 15; Mr. and Mrs. Baird owned the remaining 50. In June 1964, Baird and his wife resigned as directors and sold their stock to the corporation. From that time on the corporation operated as a close family corporation with Mr. and Mrs. Pritchard and their two sons as the only directors. After the death of Charles, Sr. in 1973, only the remaining three directors continued to operate as the board. Lillian Pritchard inherited 72 of her husband's 120 shares in Pritchard & Baird, thereby becoming the largest shareholder in the corporation with 48% of the stock.

The corporate minute books reflect only perfunctory activities by the directors, related almost exclusively to the election of officers and adoption of banking resolutions and a retirement plan. None of the minutes for any of the meetings contain a

discussion of the loans to Charles, Jr. and William or of the financial condition of the corporation. Moreover, upon instructions of Charles, Jr. that financial statements were not to be circulated to anyone else, the company's statements for the fiscal years beginning February 1, 1970, were delivered only to him.

Charles Pritchard, Sr. was the chief executive and controlled the business in the years following Baird's withdrawal. Beginning in 1966, he gradually relinquished control over the operations of the corporation. In 1968, Charles, Jr. became president and William became executive vice president. Charles, Sr. apparently became ill in 1971 and during the last year and a half of his life was not involved in the affairs of the business. He continued, however, to serve as a director until his death on December 10, 1973. Notwithstanding the presence of Charles, Sr. on the board until his death in 1973, Charles, Jr. dominated the management of the corporation and the board from 1968 until the bankruptcy in 1975.

Contrary to the industry custom of segregating funds, Pritchard & Baird commingled the funds of reinsurers and ceding companies with its own funds. All monies (including commissions, premiums and loss monies) were deposited in a single account. Charles, Sr. began the practice of withdrawing funds from the commingled account in transactions identified on the corporate books as "loans." As long as Charles, Sr. controlled the corporation, the "loans" correlated with corporate profits and were repaid at the end of each year. Starting in 1970, however, Charles, Jr. and William begin to siphon ever-increasing sums from the corporation under the guise of loans. As of January 31, 1970, the "loans" to Charles, Jr. were $230,932 and to William were $207,329. At least by January 31, 1973, the annual increase in the loans exceeded annual corporate revenues. By October 1975, the year of bankruptcy, the "shareholders' loans" had metastasized to a total of $12,333,514.47.

The trial court rejected the characterization of the payments as "loans." 162 *N.J.Super.* at 365. No corporate resolution authorized the "loans," and no note or other instrument evidenced the debt. Charles, Jr. and William paid no interest on the amounts received. The "loans" were not repaid or reduced from one year to the next; rather, they increased annually.

The designation of "shareholders' loans" on the balance sheet was an entry to account for the distribution of the premium and loss money to Charles, Sr., Charles, Jr. and William. As the trial court found, the entry was part of a "woefully inadequate and highly dangerous bookkeeping system." 162 *N.J.Super.* at 363.

The "loans" to Charles, Jr. and William far exceeded their salaries and financial resources. If the payments to Charles, Jr. and William had been treated as dividends or compensation, then the balance sheets would have shown an excess of liabilities over assets. If the "loans" had been eliminated, the balance sheets would have depicted a corporation not only with a working capital deficit, but also with assets having a fair market value less than its liabilities. The balance sheets for 1970–1975, however, showed an excess of assets over liabilities. This result was achieved by designating the misappropriated funds as "shareholders' loans" and listing them as assets offsetting the deficits. Although the withdrawal of the funds resulted in an obligation of repayment to Pritchard & Baird, the more significant consideration is that the "loans" represented a massive misappropriation of money belonging to the clients of the corporation.

The "loans" were reflected on financial statements that were prepared annually as of January 31, the end of the corporate fiscal year. Although an outside certified public accountant prepared the 1970 financial statement, the corporation prepared only internal financial statements from 1971–1975. In all instances, the statements were simple documents, consisting of three or four 8½ × 11 inch sheets.

The statements of financial condition from 1970 forward demonstrated:

| | WORKING CAPITAL DEFICIT | SHAREHOLDERS' LOANS | NET BROKERAGE INCOME |
|---|---|---|---|
| 1970 | $ 389,022 | $ 509,941 | $ 807,229 |
| 1971 | not available | not available | not available |
| 1972 | $ 1,684,289 | $ 1,825,911 | $ 1,546,263 |
| 1973 | $ 3,506,460 | $ 3,700,542 | $ 1,736,349 |
| 1974 | $ 6,939,007 | $ 7,080,629 | $ 876,182 |
| 1975 | $10,176,419 | $10,298,039 | $ 551,598. |

Those financial statements showed working capital deficits increasing annually in tandem with the amounts that Charles, Jr. and William withdrew as "shareholders' loans." In the last complete year of business (January 31, 1974, to January 31, 1975), "shareholders' loans" and the correlative working capital deficit increased by approximately $3,200,000.

The funding of the "loans" left the corporation with insufficient money to operate. Pritchard & Baird could defer payment on accounts payable because its clients allowed a grace period, generally 30 to 90 days, before the payment was due. During this period, Pritchard & Baird used the funds entrusted to it as a "float" to pay current accounts payable. By recourse to the funds of its clients, Pritchard & Baird not only paid its trade debts, but also funded the payments to Charles, Jr. and William. Thus, Pritchard & Baird was able to meet its obligations as they came due only through the use of clients' funds.

The pattern that emerges from these figures is the substantial increase in the monies appropriated by Charles Pritchard, Jr. and William Pritchard after their father's withdrawal from the business and the sharp decline in the profitability of the operation after his death. This led ultimately to the filing in December, 1975, of an involuntary petition in bankruptcy and the appointments of the plaintiffs as trustees in bankruptcy of Pritchard & Baird.

Mrs. Pritchard was not active in the business of Pritchard & Baird and knew virtually nothing of its corporate affairs. She

briefly visited the corporate offices in Morristown on only one occasion, and she never read or obtained the annual financial statements. She was unfamiliar with the rudiments of reinsurance and made no effort to assure that the policies and practices of the corporation, particularly pertaining to the withdrawal of funds, complied with industry custom or relevant law. Although her husband had warned her that Charles, Jr. would "take the shirt off my back," Mrs. Pritchard did not pay any attention to her duties as a director or to the affairs of the corporation. 162 *N.J.Super.* at 370.

After her husband died in December 1973, Mrs. Pritchard became incapacitated and was bedridden for a six-month period. She became listless at this time and started to drink rather heavily. Her physical condition deteriorated, and in 1978 she died. The trial court rejected testimony seeking to exonerate her because she "was old, was grief-stricken at the loss of her husband, sometimes consumed too much alcohol and was psychologically overborne by her sons." 162 *N.J.Super.* at 371. That court found that she was competent to act and that the reason Mrs. Pritchard never knew what her sons "were doing was because she never made the slightest effort to discharge any of her responsibilities as a director of Pritchard & Baird." 162 *N.J.Super.* at 372.

## II

A preliminary matter is the determination of whether New Jersey law should apply to this case. Although Pritchard & Baird was incorporated in New York, the trial court found that New Jersey had more significant relationships to the parties and the transactions than New York. The shareholder, officers and directors were New Jersey residents. The estates of Mr. and Mrs. Pritchard are being administered in New Jersey, and the bankruptcy proceedings involving Charles, Jr., William and Pritchard & Baird are pending in New Jersey. Virtually all transactions took place in New Jersey. Although many of the

creditors are located outside the state, all had contacts with Pritchard & Baird in New Jersey. Consequently, the trial court applied New Jersey law. 162 *N.J.Super.* at 369. The parties agree that New Jersey law should apply. We are in accord.

III

Individual liability of a corporate director for acts of the corporation is a prickly problem. Generally directors are accorded broad immunity and are not insurers of corporate activities. The problem is particularly nettlesome when a third party asserts that a director, because of nonfeasance, is liable for losses caused by acts of insiders, who in this case were officers, directors and shareholders. Determination of the liability of Mrs. Pritchard requires findings that she had a duty to the clients of Pritchard & Baird, that she breached that duty and that her breach was a proximate cause of their losses.

The New Jersey Business Corporation Act, which took effect on January 1, 1969, was a comprehensive revision of the statutes relating to business corporations. One section, *N.J.S.A.* 14A:6–14, concerning a director's general obligation had no counterpart in the old Act. That section makes it incumbent upon directors to

discharge their duties in good faith and with that degree of diligence, care and skill which ordinarily prudent men would exercise under similar circumstances in like positions. [*N.J.S.A.* 14A:6–14]

This provision was based primarily on section 43 of the Model Business Corporation Act and is derived also from section 717 of the New York Business Corporation Law (*L.*1961, *c.*855, effective September 1, 1963). Commissioners' Comments—1968 and 1972, *N.J.S.A.* 14A:6–14. Before the enactment of *N.J.S.A.* 14A:6–14, there was no express statutory authority requiring directors to act as ordinarily prudent persons under similar circumstances in like positions. Nonetheless, the requirement had been expressed in New Jersey judicial decisions.

A leading New Jersey opinion is *Campbell v. Watson*, 62 *N.J.Eq.* 396 (Ch.1901), which, like many early decisions on director liability, involved directors of a bank that had become

insolvent. A receiver of the bank charged the directors with negligence that allegedly led to insolvency. In the opinion, Vice Chancellor Pitney explained that bank depositors have a right to

rely upon the character of the directors and officers [and upon the representation] that they will perform their sworn duty to manage the affairs of the bank according to law and devote to its affairs the same diligent attention which ordinary, prudent, diligent men pay to their own affairs; and . . . such diligence and attention as experience has shown it is proper and necessary that bank directors should give to that business in order to reasonably protect the bank and its creditors against loss. [*Id.* at 406]

Because *N.J.S.A.* 14A:6–14 is modeled in part upon section 717 of the New York statute, *N.Y.Bus.Corp. Law* § 717 (McKinney), we consider also the law of New York in interpreting the New Jersey statute. *See Suter v. San Angelo Foundry & Machine Co.*, 81 *N.J.* 150, 161–162 (1979) (approving the propriety of examining as an interpretative aid the law of a state, the statute of which has been copied).

Prior to the enactment of section 717, the New York courts, like those of New Jersey, had espoused the principle that directors owed that degree of care that a businessman of ordinary prudence would exercise in the management of his own affairs. *Kavanaugh v. Gould*, 223 *N.Y.* 103, 105, 119 *N.E.* 237, 238 (Ct.App.1918); *Hun v. Cary*, 82 *N.Y.* 65, 72 (Ct.App.1880); *McLear v. McLear*, 265 *App.Div.* 556, 560, 266 *App.Div.* 702, 703, 40 *N.Y.S.2d* 432, 436 (Sup.Ct.1943), aff'd 291 *N.Y.* 809, 53 *N.E.2d* 573, 292 *N.Y.* 580, 54 *N.E.2d* 694 (Ct.App.1944); *Simon v. Socony-Vacuum Oil Co.*, 179 *Misc.* 202, 203, 38 *N.Y.S.2d* 270, 273 (Sup.Ct.1942), aff'd 267 *App.Div.* 890, 47 *N.Y.S.2d* 589 (Sup.Ct. 1944); *Van Schaick v. Aron*, 170 *Misc.* 520, 534, 10 *N.Y.S.2d* 550, 563 (Sup.Ct.1938). In addition to requiring that directors act honestly and in good faith, the New York courts recognized that the nature and extent of reasonable care depended upon the type of corporation, its size and financial resources. Thus, a bank director was held to stricter accountability than the director of

an ordinary business.[1] *Hun v. Cary, supra*, 82 *N.Y.* at 71; *Litwin v. Allen*, 25 *N.Y.S.2d* 667, 678 (Sup.Ct.1940).

In determining the limits of a director's duty, section 717 continued to recognize the individual characteristics of the corporation involved as well as the particular circumstances and corporate role of the director. Significantly, the legislative comment to section 717 states:

> The adoption of the standard prescribed by this section will allow the court to envisage the director's duty of care as a relative concept, depending on the kind of corporation involved, the particular circumstances and the corporate role of the director. [*N.Y.Bus.Corp. Law* § 717, comment (McKinney)]

This approach was consonant with the desire to formulate a standard that could be applied to both publicly and closely held entities. The report of the Chairman and chief counsel of the New York Joint Legislative Committee to Study Revision of Corporation Laws stated that the statute "reflects an attempt to merge the interests of public issue corporations and closely held corporations." Anderson & Lesher, *The New Business Corporation Law*, xxvii, reprinted in *N.Y.Bus.Corp. Law* §§ 1 to 800 xxv (McKinney).[2]

Underlying the pronouncements in section 717, *Campbell v. Watson, supra*, and *N.J.S.A.* 14A:6–14 is the principle that directors must discharge their duties in good faith and act as

---

[1]The obligations of directors of banks involve some additional consideration because of their relationship to the public generally and depositors in particular. Statutes impose certain requirements on bank directors. For example, directors of national banks must take an oath that they will diligently and honestly administer the affairs of the bank and will not permit violation of the banking laws. Moreover, they must satisfy certain requirements such as residence, citizenship, stockholdings and not serving as an investment banker. 12 *U.S.C.A.* §§ 77–78. *See generally R. Barnett, Responsibilities & Liabilities of Bank Directors* (1980).

[2]Section 717 was amended in 1977 (*L.1977, c.*432, § 4, effective September 1, 1977) to provide that directors must exercise a "degree of care" in place of a "degree of diligence, care and skill." The report of the Association of the Bar of the City of New York Committee on Corporation Law states the amendment did not alter but clarified and reaffirmed existing law. Report No. 178 on S254–A and A245–A, 544.

ordinarily prudent persons would under similar circumstances in like positions. Although specific duties in a given case can be determined only after consideration of all of the circumstances, the standard of ordinary care is the wellspring from which those more specific duties flow.

As a general rule, a director should acquire at least a rudimentary understanding of the business of the corporation. Accordingly, a director should become familiar with the fundamentals of the business in which the corporation is engaged. *Campbell, supra,* 62 *N.J.Eq.* at 416. Because directors are bound to exercise ordinary care, they cannot set up as a defense lack of the knowledge needed to exercise the requisite degree of care. If one "feels that he has not had sufficient business experience to qualify him to perform the duties of a director, he should either acquire the knowledge by inquiry, or refuse to act." *Ibid.*

Directors are under a continuing obligation to keep informed about the activities of the corporation. Otherwise, they may not be able to participate in the overall management of corporate affairs. *Barnes v. Andrews,* 298 *F.* 614 (S.D.N.Y.1924) (director guilty of misprision of office for not keeping himself informed about the details of corporate business); *Atherton v. Anderson,* 99 *F.*2d 883, 889–890 (6 Cir.1938) (ignorance no defense to director liability because of director's "duty to know the facts"); *Campbell, supra,* 62 *N.J.Eq.* at 409 (directors "bound to acquaint themselves with ... extent ... of supervision exercised by officers"); *Williams v. McKay,* 46 *N.J.Eq.* 25, 36 (Ch. 1889) (director under duty to supervise managers and practices to determine whether business methods were safe and proper). Directors may not shut their eyes to corporate misconduct and then claim that because they did not see the misconduct, they did not have a duty to look. The sentinel asleep at his post contributes nothing to the enterprise he is charged to protect. *Wilkinson v. Dodd,* 42 *N.J.Eq.* 234, 245 (Ch.1886), aff'd 42 *N.J.Eq.* 647 (E. & A. 1887).

Directorial management does not require a detailed inspection of day-to-day activities, but rather a general monitoring of corporate affairs and policies. *Williams v. McKay, supra,* at 37. Accordingly, a director is well advised to attend board meetings regularly. Indeed, a director who is absent from a board meeting is presumed to concur in action taken on a corporate matter, unless he files a "dissent with the secretary of the corporation within a reasonable time after learning of such action." *N.J.S.A.* 14A:6–13 (Supp.1981–1982). Regular attendance does not mean that directors must attend every meeting, but that directors should attend meetings as a matter of practice. A director of a publicly held corporation might be expected to attend regular monthly meetings, but a director of a small, family corporation might be asked to attend only an annual meeting. The point is that one of the responsibilities of a director is to attend meetings of the board of which he or she is a member. That burden is lightened by *N.J.S.A.* 14A:6–7(2) (Supp.1981–1982), which permits board action without a meeting if all members of the board consent in writing.

While directors' are not required to audit corporate books, they should maintain familiarity with the financial status of the corporation by a regular review of financial statements. *Campbell, supra,* 62 *N.J.Eq.* at 415; *Williams, supra,* 46 *N.J.Eq.* at 38–39; *see* Section of Corporation, Banking and Business Law, American Bar Association, "Corporate Director's Guidebook," 33 *Bus.Law.* 1595, 1608 (1978) (Guidebook); *N. Lattin, The Law of Corporations* 280 (2 ed. 1971). In some circumstances, directors may be charged with assuring that bookkeeping methods conform to industry custom and usage. *Lippitt v. Ashley,* 89 *Conn.* 451, 464, 94 *A.* 995, 1000 (Sup.Ct.1915). The extent of review, as well as the nature and frequency of financial statements, depends not only on the customs of the industry, but also on the nature of the corporation and the business in which it is engaged. Financial statements of some small corporations may be prepared internally and only on an annual basis; in a large publicly held corporation, the state-

ments may be produced monthly or at some other regular interval. Adequate financial review normally would be more informal in a private corporation than in a publicly held corporation.

■ Of some relevance in this case is the circumstance that the financial records disclose the "shareholders' loans". Generally directors are immune from liability if, in good faith, they rely upon the opinion of counsel for the corporation or upon written reports setting forth financial data concerning the corporation and prepared by an independent public accountant or certified public accountant or firm of such accountants or upon financial statements, books of account or reports of the corporation represented to them to be correct by the president, the officer of the corporation having charge of its books of account, or the person presiding at a meeting of the board. [*N.J.S.A.* 14A:6-14]

The review of financial statements, however, may give rise to a duty to inquire further into matters revealed by those statements. *Corsicana Nat'l Bank v. Johnson*, 251 *U.S.* 68, 71, 40 *S.Ct.* 82, 84, 64 *L.Ed.* 141 (1919); *Atherton, supra*, 99 *F.2d* at 890; *LaMonte v. Mott*, 93 *N.J.Eq.* 229, 239 (E. & A. 1921); *see Lippitt, supra*, 89 *Conn.* at 457, 94 *A.* at 998. Upon discovery of an illegal course of action, a director has a duty to object and, if the corporation does not correct the conduct, to resign. *See Dodd v. Wilkinson*, 42 *N.J.Eq.* 647, 651 (E. & A. 1887); *Williams v. Riley*, 34 *N.J.Eq.* 398, 401 (Ch.1881).

In certain circumstances, the fulfillment of the duty of a director may call for more than mere objection and resignation. Sometimes a director may be required to seek the advice of counsel. *Guidebook, supra*, at 1631. One New Jersey case recognized the duty of a bank director to seek counsel where doubt existed about the meaning of the bank charter. *Williams v. McKay, supra*, 46 *N.J.Eq.* at 60. The duty to seek the assistance of counsel can extend to areas other than the interpretation of corporation instruments. Modern corporate practice recognizes that on occasion a director should seek outside advice. A director may require legal advice concerning the propriety of his or her own conduct, the conduct of other officers and directors or the conduct of the corporation. In appropriate

circumstances, a director would be "well advised to consult with regular corporate counsel (or his own legal adviser) at any time in which he is doubtful regarding proposed action . . . ." *Guidebook, supra*, at 1618. Sometimes the duty of a director may require more than consulting with outside counsel. A director may have a duty to take reasonable means to prevent illegal conduct by co-directors; in an appropriate case, this may include threat of suit. *See Selheimer v. Manganese Corp.*, 423 *Pa.* 563, 572, 584, 224 *A.*2d 634, 640, 646 (Sup.Ct.1966) (director exonerated when he objected, resigned, organized shareholder action group, and threatened suit).

A director is not an ornament, but an essential component of corporate governance. Consequently, a director cannot protect himself behind a paper shield bearing the motto, "dummy director." *Campbell, supra*, 62 *N.J.Eq.* at 443 ("The directors were not intended to be mere figure-heads without duty or responsibility"); *Williams v. McKay, supra*, 46 *N.J.Eq.* at 57–58 (director voluntarily assuming position also assumes duties of ordinary care, skill and judgment). The New Jersey Business Corporation Act, in imposing a standard of ordinary care on all directors, confirms that dummy, figurehead and accommodation directors are anachronisms with no place in New Jersey law. *See N.J.S.A.* 14A:6–14. Similarly, in interpreting section 717, the New York courts have not exonerated a director who acts as an "accommodation." *Barr v. Wackman*, 36 *N.Y.*2d 371, 381, 329 *N.E.*2d 180, 188, 368 *N.Y.S.*2d 497, 507 (Ct.App.1975) (director "does not exempt himself from liability by failing to do more than passively rubber-stamp the decisions of the active managers"). *See Kavanaugh v. Gould, supra*, 223 *N.Y.* at 111–117, 119 *N.E.* at 240–241 (the fact that bank director never attended board meetings or acquainted himself with bank's business or methods held to be no defense, as a matter of law, to responsibility for speculative loans made by the president and acquiesced in by other directors). Thus, all directors are responsible for managing the business and affairs of the corporation.

*N.J.S.A.* 14A:6–1 (Supp.1981–1982); 1 *G. Hornstein, Corporation Law and Practice* § 431 at 525 (1959).

The factors that impel expanded responsibility in the large, publicly held corporation may not be present in a small, close corporation.[3] Nonetheless, a close corporation may, because of the nature of its business, be affected with a public interest. For example, the stock of a bank may be closely held, but because of the nature of banking the directors would be subject to greater liability than those of another close corporation. Even in a small corporation, a director is held to the standard of that degree of care that an ordinarily prudent director would

---

[3] Our decision is based on directorial responsibilities arising under state statutory and common law as distinguished from the Securities Act of 1933, 15 *U.S.C.* § 77a *et seq.*, and the Securities Exchange Act of 1934, 15 *U.S.C.* § 78a *et seq.* Nonetheless, we recognize significant developments in directorial liability under both Acts and related rules and regulations of the Securities and Exchange Commission. For example, an outside director may be liable in negligence under section 11 of the 1933 Act for the failure to make a reasonable investigation before signing a registration statement. *Escott v. Barchris Constr. Corp.*, 283 *F.Supp.* 643, 687–689 (S.D.N.Y.1968); *see also Feit v. Leasco Data Processing Equip. Corp.*, 332 *F.Supp.* 544, 575–576 (E.D.N.Y.1971) (outside director who was partner in law firm for corporation considered an insider). The Securities and Exchange Commission has made it clear that outside directors should become knowledgeable about a company's business and accounting practices so that they may make "an informed judgment of its more important affairs or the abilities and integrity of the officers." Securities Exchange Act of 1934, Release No. 11,516 (July 2, 1975). With respect to actions under section 10 of the 1934 Act and Rule 10b5, which prohibit false statements in the purchase or sale of securities, liability is not imposed for mere negligence, but only if one acts with scienter, *i. e.,* the intent to deceive, manipulate or defraud. *Ernst & Ernst v. Hochfelder*, 425 *U.S.* 185, 96 *S.Ct.* 1375, 47 *L.Ed.*2d 668 (1976) (outside accountant not liable in negligence for failure to conduct a proper audit).

Recently the United States Supreme Court described the Federal Securities Acts in the area of director liability as "regulatory and prohibitory in nature—it often limits the exercise of directorial power, but only rarely creates it." *Burks v. Lasker*, 441 *U.S.* 471, 99 *S.Ct.* 1831, 1837, 60 *L.Ed.*2d 404 (1979). In *Burks*, the Court described corporations as creatures of state law and declared "'it is state law which is the font of corporate directors' powers." *Ibid. See generally* Goldstein & Shepherd, "Director Duties and

use under the circumstances. *M. Mace, The Board of Directors of Small Corporations* 83 (1948).

 A director's duty of care does not exist in the abstract, but must be considered in relation to specific obligees. In general, the relationship of a corporate director to the corporation and its stockholders is that of a fiduciary. *Whitfield v. Kern,* 122 *N.J.Eq.* 332, 341 (E. & A. 1937). Shareholders have a right to expect that directors will exercise reasonable supervision and control over the policies and practices of a corporation. The institutional integrity of a corporation depends upon the proper discharge by directors of those duties.

 While directors may owe a fiduciary duty to creditors also, that obligation generally has not been recognized in the absence of insolvency. *Whitfield, supra,* 122 *N.J.Eq.* at 342, 345. With certain corporations, however, directors are seemed to owe a duty to creditors and other third parties even when the corporation is solvent. Although depositors of a bank are considered in some respects to be creditors, courts have recognized that directors may owe them a fiduciary duty. *See Campbell, supra,* 62 *N.J.Eq.* at 406–407. Directors of nonbanking corporations may owe a similar duty when the corporation holds funds of others in trust. *Cf. McGlynn v. Schultz,* 90 *N.J.Super.* 505 (Ch.Div.1966), aff'd 95 *N.J.Super.* 412 (App.Div.) certif. den. 50 *N.J.* 409 (1967) (directors who did not insist on segregating trust funds held by corporation liable to the *cestuis que trust*).

In three cases originating in New Jersey, directors who did not participate actively in the conversion of trust funds were found not liable. In each instance, the facts did not support the conclusion that the director knew or could have known of the wrongdoing even if properly attentive. *McGlynn, supra,* 90 *N.J.Super.* at 509, 511 (director from Chicago not "in a position to know the details of the corporation's business" not liable for conversions that occurred over four month period); *General*

Liabilities under the Securities Acts and Corporation Laws," 36 *Wash. & Lee L. Rev.* 759, 763–773 (1979).

*Films, Inc. v. Sanco Gen. Mfg. Corp.*, 153 *N.J.Super.* 369, 371 (App.Div.1977), certif. den. 75 *N.J.* 614 (1978) (director and sole shareholder not liable for conversion by dominant principal, her husband, in misappropriating proceeds of single check); *Ark-Tenn Distrib. Corp. v. Breidt*, 209 *F.*2d 359, 360 (3 Cir. 1954) (president who was not active in corporation not liable for conversion of trust funds received in single transaction). To the extent that the cases support the proposition that directors are not liable unless they actively participate in the conversion of trust funds, they are disapproved.

Courts in other states have imposed liability on directors of non-banking corporations for the conversion of trust funds, even though those directors did not participate in or know of the conversion. *Preston-Thomas Constr. Inc. v. Central Leasing Corp.*, 518 *P.*2d 1125 (Okl.Ct.App.1973) (director liable for conversion of funds entrusted to corporation for acquisition of stock in another corporation); *Vujacich v. Southern Commercial Co.*, 21 *Cal.App.* 439, 132 *P.* 80 (Dist.Ct.App.1913) (director of wholesale grocery business personally liable for conversion by corporation of worker's funds deposited for safekeeping). The distinguishing circumstances in regard to banks and other corporations holding trust funds is that the depositor or beneficiary can reasonably expect the director to act with ordinary prudence concerning the funds held in a fiduciary capacity. Thus, recognition of a duty of a director to those for whom a corporation holds funds in trust may be viewed as another application of the general rule that a director's duty is that of an ordinary prudent person under the circumstances.

The most striking circumstances affecting Mrs. Pritchard's duty as a director are the character of the reinsurance industry, the nature of the misappropriated funds and the financial condition of Pritchard & Baird. The hallmark of the reinsurance industry has been the unqualified trust and confidence reposed by ceding companies and reinsurers in reinsurance brokers. Those companies entrust money to reinsurance intermediaries with the justifiable expectation that the funds will be transmit-

ted to the appropriate parties. Consequently, the companies could have assumed rightfully that Mrs. Pritchard, as a director of a reinsurance brokerage corporation, would not sanction the comingling and the conversion of loss and premium funds for the personal use of the principals of Pritchard & Baird.

As a reinsurance broker, Pritchard & Baird received annually as a fiduciary millions of dollars of clients' money which it was under a duty to segregate.[4] To this extent, it resembled a bank rather than a small family business. Accordingly, Mrs. Pritchard's relationship to the clientele of Pritchard & Baird was akin to that of a director of a bank to its depositors. All parties agree that Pritchard & Baird held the misappropriated funds in an implied trust. That trust relationship gave rise to a fiduciary duty to guard the funds with fidelity and good faith. *Ellsworth Dobbs, Inc. v. Johnson*, 50 *N.J.* 528, 553 (1967); *General Films, Inc. v. Sanco Gen. Mfg. Corp., supra*, 153 *N.J.Super.* at 372–373.

As a director of a substantial reinsurance brokerage corporation, she should have known that it received annually millions of dollars of loss and premium funds which it held in trust for ceding and reinsurance companies. Mrs. Pritchard should have obtained and read the annual statements of financial condition of Pritchard & Baird. Although she had a right to rely upon financial statements prepared in accordance with *N.J.S.A.* 14A:6–14, such reliance would not excuse her conduct. The reason is that those statements disclosed on their face the misappropriation of trust funds.

From those statements, she should have realized that, as of January 31, 1970, her sons were withdrawing substantial trust funds under the guise of "Shareholders' Loans." The financial statements for each fiscal year commencing with that of Janu-

---

[4]Following the Pritchard & Baird bankruptcy, New York, a reinsurance center, adopted legislation regulation reinsurance intermediaries. One statute codified the industry standard by prohibiting reinsurance intermediaries from commingling their funds with funds of their principals. *N.Y. Ins. Law* § 122–a(9) (McKinney Supp. 1980–1981).

ary 31, 1970, disclosed that the working capital deficits and the "loans" were escalating in tandem. Detecting a misappropriation of funds would not have required special expertise or extraordinary diligence; a cursory reading of the financial statements would have revealed the pillage. Thus, if Mrs. Pritchard had read the financial statements, she would have known that her sons were converting trust funds. When financial statements demonstrate that insiders are bleeding a corporation to death, a director should notice and try to stanch the flow of blood.

In summary, Mrs. Pritchard was charged with the obligation of basic knowledge and supervision of the business of Pritchard & Baird. Under the circumstances, this obligation included reading and understanding financial statements, and making reasonable attempts at detection and prevention of the illegal conduct of other officers and directors. She had a duty to protect the clients of Pritchard & Baird against policies and practices that would result in the misappropriation of money they had entrusted to the corporation. She breached that duty.

## IV

Nonetheless, the negligence of Mrs. Pritchard does not result in liability unless it is a proximate cause of the loss. *Kulas v. Public Serv. Elec. and Gas Co.*, 41 *N.J.* 311, 317 (1964). Analysis of proximate cause requires an initial determination of cause-in-fact. Causation-in-fact calls for a finding that the defendant's act or omission was a necessary antecedent of the loss, *i. e..*, that if the defendant had observed his or her duty of care, the loss would not have occurred. *Ibid., W. Prosser, Law of Torts* § 41 at 238 (4 ed. 1971). Further, the plaintiff has the burden of establishing the amount of the loss or damages caused by the negligence of the defendant. *H. Henn, Law of Corporations* § 234 at 456 (2 ed. 1970). Thus, the plaintiff must establish not only a breach of duty, "but in addition that the performance by the director of his duty would have avoided loss, and the amount of the resulting loss." 1 *Hornstein, supra,* § 446 at 566.

Cases involving nonfeasance present a much more difficult causation question than those in which the director has committed an affirmative act of negligence leading to the loss. Analysis in cases of negligent omissions calls for determination of the reasonable steps a director should have taken and whether that course of action would have averted the loss.

Usually a director can absolve himself from liability by informing the other directors of the impropriety and voting for a proper course of action. Dyson, "The Director's Liability for Negligence," 40 *Ind.L.J.* 341, 365 (1965). Conversely, a director who votes for or concurs in certain actions may be "liable to the corporation for the benefit of its creditors or shareholders, to the extent of any injuries suffered by such persons, respectively, as a result of any such action." *N.J.S.A.* 14A:6–12 (Supp.1981–1982). A director who is present at a board meeting is presumed to concur in corporate action taken at the meeting unless his dissent is entered in the minutes of the meeting or filed promptly after adjournment. *N.J.S.A.* 14A:6–13. In many, if not most, instances an objecting director whose dissent is noted in accordance with *N.J.S.A.* 14A:6–13 would be absolved after attempting to persuade fellow directors to follow a different course of action. *Cf. McGlynn, supra,* 90 *N.J.Super.* at 520–521, 529 (receiver had no case against director who advised president that certain funds should be escrowed, wrote to executive committee to that effect, and objected at special meeting of board of directors); *Selheimer v. Manganese Corp., supra,* 423 *Pa.* at 572, 584, 224 *A.2d* at 640, 646 (dissenting minority director in publicly held corporation absolved because he did all he could to divert majority directors from their course of conduct by complaining to management, threatening to institute suit and organizing a stockholders' committee).

Even accepting the hypothesis that Mrs. Pritchard might not be liable if she had objected and resigned, there are two significant reasons for holding her liable. First, she did not resign until just before the bankruptcy. Consequently, there is no

factual basis for the speculation that the losses would have occurred even if she had objected and resigned. Indeed, the trial court reached the opposite conclusion: "The actions of the sons were so blatantly wrongful that it is hard to see how they could have resisted any moderately firm objection to what they were doing." 162 *N.J.Super.* at 372. Second, the nature of the reinsurance business distinguishes it from most other commercial activities in that reinsurance brokers are encumbered by fiduciary duties owed to third parties. In other corporations, a director's duty normally does not extend beyond the shareholders to third parties.

In this case, the scope of Mrs. Pritchard's duties was determined by the precarious financial condition of Pritchard & Baird, its fiduciary relationship to its clients and the implied trust in which it held their funds. Thus viewed, the scope of her duties encompassed all reasonable action to stop the continuing conversion. Her duties extended beyond mere objection and resignation to reasonable attempts to prevent the misappropriation of the trust funds. *Campbell, supra,* 62 *N.J.Eq.* at 427.

A leading case discussing causation where the director's liability is predicated upon a negligent failure to act is *Barnes v. Andrews*, 298 *F.* 614 (S.D.N.Y.1924). In that case the court exonerated a figurehead director who served for eight months on a board that held one meeting after his election, a meeting he was forced to miss because of the death of his mother. Writing for the court, Judge Learned Hand distinguished a director who fails to prevent general mismanagement from one such as Mrs. Pritchard who failed to stop an illegal "loan":

> When the corporate funds have been illegally lent, it is a fair inference that a protest would have stopped the loan, and that the director's neglect caused the loss. But when a business fails from general mismanagement, business incapacity, or bad judgment, how is it possible to say that a single director could have made the company successful, or how much in dollars he could have saved? [*Id.* at 616–617]

Pointing out the absence of proof of proximate cause between defendant's negligence and the company's insolvency, Judge Hand also wrote:

> The plaintiff must, however, go further than to show that [the director] should have been more active in his duties. This cause of action rests upon a tort, as much though it be a tort of omission as though it had rested upon a positive act. The plaintiff must accept the burden of showing that the performance of the defendant's duties would have avoided loss, and what loss it would have avoided. [*Id.* at 616]

Other courts have refused to impose personal liability on negligent directors when the plaintiffs have been unable to prove that diligent execution of the directors' duties would have precluded the losses. *Briggs v. Spaulding*, 141 *U.S.* 132, 11 *S.Ct.* 924, 35 *L.Ed.* 662 (1891) (no causal relationship because discovery of defalcations could have resulted only from examination of books beyond duty of director); *Hoehn v. Crews*, 144 *F.*2d 665 (10 Cir. 1944) (failure of bank director to publish notice of liquidation of bank not proximate cause of loss to creditors who did not know at time of liquidation that they had a claim); *Virginia-Carolina Chem. Co. v. Ehrich*, 230 *F.* 1005 (E.D.S.C. 1916) (close supervision of daily corporate affairs necessary to notice wrongdoing; failure to attend meetings not causally related to loss); *LaMonte v. Mott, supra* (director who had been in office for less than two years and had conducted only one examination held not liable); *Sternberg v. Blaine*, 179 *Ark.* 448, 17 *S.W.*2d 286 (Sup.Ct.1929) ("[n]o ordinary examination usually made by directors of a country bank, however careful, would have discovered" misappropriations); *Holland v. American Founders Life Ins. Co.*, 151 *Colo.* 69, 376 *P.*2d 162 (Sup.Ct.1962) (conduct "not a contributing cause of the loss sustained because director did not neglect his duty as secretary-director"); *Wallach v. Billings*, 277 *Ill.* 218, 115 *N.E.* 382 (Sup.Ct.1917), *cert. den.* 244 *U.S.* 659, 37 *S.Ct.* 745, 61 *L.Ed.* 1376 (1917) (inactive director not liable because no allegation in complaint that losses caused by director negligence or that director could have prevented losses); *Allied Freightways, Inc. v. Cholfin*, 325 *Mass.* 630, 91 *N.E.*2d 765 (Sup.Jud.Ct.1950) (director not liable where losses resulted from general mismanagement and director, in the reasonable exercise of her duties, could not have discovered illegal payments from examination of corporate books); *Hathaway v.*

*Huntley*, 284 *Mass.* 587, 188 *N.E.* 616 (Sup.Jud.Ct.1933) (negligent director not liable for bankruptcy losses caused by husband's policy of business expansion and not discernible in books by use of reasonable care and diligence); *Martin v. Hardy*, 251 *Mich.* 413, 232 *N.W.* 197 (Sup.Ct.1930) (six-month sale of stock below cost resulting in $37,000 loss to corporation not causally related to director negligence); *Henry v. Wellington Tel. Co.*, 76 *Ohio App.* 77, 63 *N.E.2d* 233 (Ct.App.1945) (though directors failed to comply with formalities of statute, that failure did not result in loss).

Other courts have held directors liable for losses actively perpetrated by others because the negligent omissions of the directors were considered a necessary antecedent to the defalcations. *Atherton, supra* (directors liable for bank losses proximately caused by failure to supervise officers and to examine auditor's reports); *Ringeon v. Albinson*, 35 *F.2d* 753 (D.Minn. 1929) (negligent director not excused from liability for losses that could have been prevented by supervision and prompt action); *Heit v. Bixby*, 276 *F.Supp.* 217, 231 (E.D.Mo.1967) (directors liable for 40% commissions taken by co-directors because directors' "lackadaisical attitude" proximately caused the loss); *Ford v. Taylor*, 176 Ark. 843, 4 *S.W.2d* 938 (1928) (bank directors liable for losses due to misappropriations of cashier who "felt free to pursue [misconduct] without fear of detection by the directors through their failure to discharge the functions of their office"); *Vujacich v. Southern Commercial Co., supra*, (unless some showing of protest made, director liable for loss resulting from misappropriation of co-director); *Chicago Title & Trust Co. v. Munday*, 297 *Ill.* 555, 131 *N.E.* 103 (Sup.Ct.1921) (complaint states good cause of action alleging inactive directors responsible for officer's defalcations occurring as consequence of omission of directors' duty of supervision); *Coddington v. Canaday*, 157 *Ind.* 243, 61 *N.E.* 567 (Sup.Ct.1901) (directors liable for losses resulting from bank insolvency due to improper supervision and concomitant acceptance of worthless notes); *Bentz v. Vardaman Mfg. Co.*, 210 *So.2d* 35 (Miss.Sup.Ct.1968) (nonatten-

dance at director meetings no relief from director liability for losses resulting from action taken at meetings); *Tri-Bullion Smelting & Development Co. v. Corliss*, 230 *N.Y.* 629, 130 *N.E.* 921 (Ct.App.1921) (directors liable for misappropriations by treasurer resulting from negligence of directors); *Neese v. Brown*, 218 *Tenn.* 686, 405 *S.W.2d* 577 (Sup.Ct.1964) (directors who abdicate control liable for losses caused by breach of trust by those left in control if due care on part of inactive directors could have avoided loss).

In assessing whether Mrs. Pritchard's conduct was a legal or proximate cause of the conversion, "[l]egal responsibility must be limited to those causes which are so closely connected with the result and of such significance that the law is justified in imposing liability." *Prosser, supra*, § 41 at 237. Such a judicial determination involves not only considerations of causation-in-fact and matters of policy, but also common sense and logic. *Caputzal v. The Lindsay Co.*, 48 *N.J.* 69, 77–78 (1966). The act or the failure to act must be a substantial factor in producing the harm. *Prosser, supra*, § 41 at 240; *Restatement (Second) of Torts*, §§ 431, 432 (1965).

Within Pritchard & Baird, several factors contributed to the loss of the funds: comingling of corporate and client monies, conversion of funds by Charles, Jr. and William and dereliction of her duties by Mrs. Pritchard. The wrongdoing of her sons, although the immediate cause of the loss, should not excuse Mrs. Pritchard from her negligence which also was a substantial factor contributing to the loss. *Restatement (Second) of Torts, supra*, § 442B, comment b. Her sons knew that she, the only other director, was not reviewing their conduct; they spawned their fraud in the backwater of her neglect. Her neglect of duty contributed to the climate of corruption; her failure to act contributed to the continuation of that corruption. Consequently, her conduct was a substantial factor contributing to the loss.

Analysis of proximate cause is especially difficult in a corporate context where the allegation is that nonfeasance of a director is a proximate cause of damage to a third party.

Where a case involves nonfeasance, no one can say "with absolute certainty what would have occurred if the defendant had acted otherwise." *Prosser, supra*, § 41 at 242. Nonetheless, where it is reasonable to conclude that the failure to act would produce a particular result and that result has followed, causation may be inferred. *Ibid.* We conclude that even if Mrs. Pritchard's mere objection had not stopped the depredations of her sons, her consultation with an attorney and the threat of suit would have deterred them. That conclusion flows as a matter of common sense and logic from the record. Whether in other situations a director has a duty to do more than protest and resign is best left to case-by-case determinations. In this case, we are satisfied that there was a duty to do more than object and resign. Consequently, we find that Mrs. Pritchard's negligence was a proximate cause of the misappropriations.

To conclude, by virtue of her office, Mrs. Pritchard had the power to prevent the losses sustained by the clients of Pritchard & Baird. With power comes responsibility. She had a duty to deter the depredation of the other insiders, her sons. She breached that duty and caused plaintiffs to sustain damages.

The judgment of the Appellate Division is affirmed.

*For affirmance*—Justices SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER, HANDLER and POLLOCK—6.

*For reversal—none.*